CNA Casualty of Puerto Rico, Manufacturers Trust Insurance Company, demandante y recurrido, *v.* Migdalia Torres Díaz y otros, demandados y recurrentes.

*Número:* RE-91-578 *Resuelto:* 11 de junio de 1996

28

30

*Pablo Carrasquillo*, abogado de la parte recurrente; *Manuel E. Moraza Choisne*, abogado de la parte recurrida.

EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ emitió la opinión del Tribunal.

Los hechos en este caso fueron estipulados por las partes, por lo que *no* existe controversia en cuanto a éstos. La demandada recurrente, Lcda. Migdalia Torres Díaz, suscribió un contrato de arrendamiento financiero (*lease agreement*, en adelante *lease*) el 13 de diciembre de 1984 con el Chase Manhattan Bank N.A. (en adelante *Chase*), mediante el cual arrendó un vehículo de motor marca BMW. En el contrato de *lease* en cuestión se estableció que ésta pagaría la cantidad a ser financiada en sesenta (60) plazos, cantidad que ascendía a diecisiete mil noventa y cinco dólares ($17,095).

El contrato suscrito por las partes, entre otras cosas, especificaba que la arrendataria asumía todos los riesgos y se *comprometía* a indemnizar al arrendador por los daños, la pérdida o la destrucción de la unidad arrendada, exceptúandose de dicha obligación aquellos actos u omisiones, negligentes o culposos, atribuibles al arrendador. *El contrato, además, le requería a la licenciada Torres Díaz la obtención de una póliza de seguro que cubriera el riesgo de daño o pérdida de la unidad arrendada endosada a favor del Chase.* De acuerdo con el contrato de *lease*, el *incumplimiento* de dicha obligación *facultaba* al arrendador a declarar vencido el contrato y a recobrar los cánones pendientes no satisfechos por la arrendataria.

El 2 de marzo de 1988, el vehículo de la recurrente fue hurtado y, posteriormente, *recuperado completamente quemado.* Al ocurrir este incidente, *la recurrente no había renovado la póliza de seguro que le requería el contrato de "lease".* Por su parte, el Chase había adquirido una póliza de seguro (*commercial casualty policy*) con CNA Casualty of Puerto Rico (en adelante CNA), que garantizaba el interés económico del Chase en *todos* los vehículos arrendados por éste a través de su división de *leasing.*

Conforme con los términos del contrato de seguro suscrito por el Chase y CNA, esta última pagó al Chase la cantidad de trece mil cuatrocientos veintiún dólares con

sesenta y cuatro centavos ($13,421.64) como indemnización por la pérdida de la unidad arrendada a la recurrente. *Dicha cantidad fue calculada a base de los cánones restantes no pagados por la recurrente, y no por el valor real del vehículo.* Como parte de esta transacción, el Chase otorgó un documento a favor de CNA titulado *Sworn Statement in Proof of Loss (Automobile)*, mediante el cual "subrogó" a la aseguradora en todos los derechos que tenía como consecuencia del otorgamiento del contrato de *lease*. Una vez subrogado en los derechos del Chase, CNA instó una demanda contra la arrendataria, en cobro por la cantidad pagada al Banco, ante el antiguo Tribunal Superior de Puerto Rico, Sala de Bayamón. CNA apoyó su reclamo en la Cláusula 13 del *lease agreement*, la cual facultaba al arrendador a declarar vencido el contrato y acelerar los cánones todavía adeudados debido a incumplimiento, específicamente el de no asegurar la unidad arrendada.

Así las cosas, el tribunal de instancia declaró *con* lugar la demanda y condenó a la recurrente a satisfacer la cantidad de trece mil cuatrocientos veintiún dólares con sesenta y cuatro centavos ($13,421.64), más la suma de mil dólares ($1,000) de honorarios de abogado por temeridad. Inconforme, la licenciada Torres Díaz acudió ante este Tribunal señalando varios errores, a saber:

1) [E]rró ... al conceder en subrogación al asegurador CNA Casualty (Demandante-Recurrido) la facultad de cobrar contra la SRA. TORRES (Demandada-Recurrente) el remanente de los plazos no devengados del "Lease Agreement" cuando:
 (a) El Chase no cedió a CNA ese derecho.
 (b) A CNA no le correspondía ese derecho bajo las disposiciones de la póliza que cubría el BMW asegurado, el cual fue robado y quemado totalmente y pagado por CNA al Chase.
2) [E]rró ... al imponer a la SRA. TORRES (Demandada-Recurrente) el pago de honorarios de abogado por temeridad, al defenderse en este caso novel. Alegato de la demandada-recurrente, pág. 6.

Expedimos el auto de revisión radicado. Estando en posición de resolver el recurso, procedemos a así hacerlo.

# I

El contrato de *leasing*, o arrendamiento financiero, es un negocio jurídico cuyo contenido está formado por varias declaraciones de voluntad, las cuales producen una relación jurídica y establecen los términos que la regulan. Dicho contrato no había sido objeto, *hasta fecha reciente*,([1]) de atención por parte de la Asamblea Legislativa de Puerto Rico; razón por la cual, el presente caso se rige por el principio de la autonomía negocial. En *Meyers Bros. v. Gelco*, 114 D.P.R. 116, 121 (1983), al enfrentarnos por primera vez a la institución del *leasing*, o arrendamiento financiero, expresamos que el mismo es "un contrato atípico, sui géneris, producto de la realidad cambiante del tráfico mercantil".

Los contratos de *leasing* contienen obligaciones y derechos para cada una de las partes. Por un lado, el arrendador tiene derecho a exigir al arrendatario el pago del precio estipulado, a inspeccionar la utilización y conservación de la unidad arrendada, a reclamar indemnización en algunos casos y a resolver el contrato en caso de incumplimiento de las obligaciones por parte del arrendatario. En cuanto a las obligaciones que puede tener la empresa arrendadora se encuentran el adquirir la unidad a ser arrendada del proveedor que escoja el arrendatario; informar a dicho proveedor de la obligación de entregar la unidad al arrendatario a tiempo y en perfectas condiciones, y la continuación del arrendamiento durante el plazo establecido, excepto en aquellos casos en que el arrendatario incurra en incumplimiento. No obstante, estas obligaciones impuestas al arrendador resultan ser mínimas debido a la

---

([1]) Recientemente, la Legislatura de Puerto Rico aprobó la Ley Núm. 76 de 13 de agosto de 1994 (10 L.P.R.A. sec. 2401 *et seq.*), la cual reglamenta el alquiler de bienes muebles, específicamente el arrendamiento financiero o *lease*. De acuerdo con el Art. 3 del Código Civil, 31 L.P.R.A. sec. 3, *no procede que analicemos el caso de autos a la luz de esta nueva legislación, ya que la misma no es de aplicación retroactiva.*

inclusión en los contratos de cláusulas de exoneración o de liberación de responsabilidad. C. Vidal Blanco, *El leasing, una innovación en la técnica de la financiación*, Madrid, Ed. Instituto de Estudios Fiscales, 1977, págs. 113–114.

 Por su parte, el arrendatario tiene derecho a exigir la entrega de la unidad estipulada, al uso de ésta siempre que sea conforme a lo estipulado en el contrato, a elegir una de las tres (3) opciones disponibles al final del contrato y a adquirir la propiedad de la unidad arrendada en cualquier momento durante la vigencia del contrato, siempre que haya sido pactado y que pague anticipadamente la totalidad de los cánones pendientes y el valor residual. El arrendatario queda obligado a pagar los cánones establecidos en el contrato, a utilizar la unidad con el debido cuidado y diligencia de modo que se garantice su conservación y buen funcionamiento, y a sufragar los gastos de mantenimiento, reparaciones y seguros necesarios y todos los demás gastos y cargas previstas en el contrato. Vidal Blanco, *op. cit.*, pág. 114; J. Puig Brutau, *Fundamentos de Derecho Civil*, 3ra ed., Barcelona, Ed. Bosch, 1988, T. II, Vol. 1, pág. 417.

 Por lo general, los contratos de arrendamiento financiero contienen ciertas garantías destinadas a proteger al arrendador de sucesos inadvertidos que puedan producirse durante la duración del contrato. Hemos expresado anteriormente que la entidad que lleva a cabo el arrendamiento financiero es la propietaria del bien arrendado hasta el final del mismo. *Nieves Vélez v. Bansander Leasing Corp.*, 136 D.P.R. 827 (1994); *Meyers Bros. v. Gelco*, ante. *Para proteger el interés económico del arrendador de cualquier incidencia que pueda sobrevenir durante el uso de la unidad arrendada, de ordinario se exige un seguro como garantía por cuenta del usuario.* Es decir, que los contratos de arrendamiento financiero exigen al usuario a suscribir una póliza de seguro en la que el arrendador debe figurar como beneficiario en caso de daño o pérdida de la

cosa, además de la obligación de hacer entrega al arrendador de una copia de dicha póliza. M. Gutiérrez Viguera, *El leasing como institución financiera*, Madrid, Ed. Asociación para el Progreso de la Dirección, 1977, págs. 85–86; J. De la Cuesta Rute, *Reflexiones en torno al leasing*, 47 Rev. Der. Mercantil 533, 588 (1970). En aquellos casos en que la unidad sufra daño total o parcial, la indemnización del seguro adquirido por el usuario será pagada al arrendador, y de no satisfacerse la totalidad de los daños, el arrendatario responderá por la diferencia para la reparación íntegra de la unidad. Vidal Blanco, *op. cit.*, pág. 117.

■■■ Por otro lado, desde que se lleva a cabo la entrega, el usuario asume todos los riesgos de la unidad objeto del contrato, "incluso los derivados de caso fortuito, por fuerza mayor y hecho de tercero". L. Rojo Ajuria, *"Leasing" mobiliario*, Madrid, Ed. Tecnos, 1987, pág. 262. En aquellos casos en que la unidad arrendada se pierda en todo o en parte por caso fortuito, fuerza mayor o por causa de un tercero, el usuario no se libera de la obligación de continuar pagando los cánones establecidos en el contrato.[2] *El usuario no sólo es responsable por no devolver la unidad, sino que responde por la obligación de pagar las rentas pendientes y el valor residual previsto, aunque la cosa se haya perdido o deteriorado por caso fortuito o fuerza mayor, ya que esto no supone la extinción del contrato.* De la Cuesta Rute, *supra*, pág. 589. *Esta norma, adoptada por la industria del arrendamiento financiero, es contraria a la figura del arrendamiento regulada por nuestro Código Civil, el cual dispone que el arrendatario no responderá cuando la cosa arrendada se pierda sin su culpa.* 31 L.P.R.A. sec. 4060.[3]

---

[2] A esos efectos, Vidal Blanco expresa:

"No obstante, las Sociedades de Leasing, prevén en sus contratos, que cualquier siniestro total o parcial no interrumpirá el arrendamiento ni cambiará los vencimientos de los plazos." C. Vidal Blanco, *El leasing, una innovación en la técnica de la financiación*, Madrid, Ed. Instituto de Estudios Fiscales, 1977, pág. 119.

[3] El Art. 1453 de nuestro Código Civil expresa:

█ Para proteger el carácter financiero de esta industria se han establecido en los contratos de arrendamiento financiero unas cláusulas que hacen al usuario responsable de la destrucción o deterioro, cualquiera que sea la causa, además de facultar al arrendador a hacer uso de la resolución del contrato con derecho al pago de los alquileres que quedan por pagar. Este tipo de cláusulas tiene la finalidad de impedir que la pérdida de la unidad arrendada se convierta en una pérdida financiera para el arrendador.(⁴) *Es por esta razón que en caso de pérdida de la unidad no se obliga a pagar al usuario el valor de ella al momento de la pérdida, sino que se calcula a base de los cánones restantes no pagados.*

## II

En el caso de autos, la recurrente suscribió un contrato de arrendamiento financiero con el Chase, donde se establecen los derechos y las obligaciones de las partes. La Cláusula 9 de dicho contrato, Apéndice, pág. 50, *claramente* establecía la asunción de todos los riesgos por parte del arrendatario por daños, hurto, pérdida o destrucción parcial o total de la unidad arrendada.(⁵) Dicha cláusula,

---

"El arrendatario es responsable del deterioro o pérdida que tuviere la cosa arrendada, a no ser que pruebe haberse ocasionado sin su culpa." 31 L.P.R.A. sec. 4060.

(⁴) En torno a dicho asunto, J. De la Cuesta Rute, en su artículo *Reflexiones en torno al leasing*, 47 Rev. Der. Mercantil 533, 589 (1970), expresa:

"En la medida que el contrato se aparta del arrendamiento, según todo lo expuesto, se hace clara la esencia de la finalidad de la operación, que consiste para la empresa financiera en recuperar el producto íntegro de su inversión en todo caso, adoptándose las disposiciones pertinentes para satisfacerse, cuando proceda, por un mecanismo paralelo al de la aplicación del principio de subrogación real en los supuestos de garantías reales. Tal resultado implica para el supuesto arrendatario la asunción de la totalidad de las cargas y riesgos propios del dominio."

(⁵) La Cláusula 9 expresa:

*"Lessee agrees to indemnify*, protect, save and keep harmless *Lessor, its assigns,* ... *from and against any and all losses*, liabilities, damages, injuries, claims, demands and expenses, *including legal expenses,* ... *Lessee agrees to bear all risk of and indemnify Lessor against damage, theft, loss or destruction partial or complete*, of each Unit from any cause whatsoever. This covenant of indemnify shall continue in full force and effect notwithstanding termination of this Lease, but shall not apply to Lessor's willful or negligent acts or omissions." (Énfasis suplido.) Apéndice, pág. 50.

además de ser clara en su lenguaje, establece la obligación del arrendatario de cuidar la cosa como un buen padre de familia, ya que éste asume todos los riesgos de pérdida o daño de la unidad arrendada.

Para proteger el interés económico tanto del usuario como del arrendador, y para minimizar la carga de la asunción de riesgos por parte del usuario, el contrato de *leasing* que ocupa nuestra atención contenía la Cláusula 7 titulada "Insurance". Apéndice, pág. 50. *Dicha cláusula obligaba a la arrendataria a adquirir y mantener unas pólizas de seguro en las que el Chase sería el beneficiario.* Éstas pólizas requerían una cubierta de responsabilidad por daños a la persona y a la propiedad, y otra que incluyera hurto, fuego y los riesgos de daños físicos a la unidad. *De interesar el arrendatario obtener las pólizas a través del Chase, la Cláusula 7 le imponía el deber de solicitarlo por escrito al arrendador, lo cual no sucedió en el caso de autos.* Finalmente, la referida Cláusula 7 establecía que cuando la arrendataria omitiera la obligación de mantener vigente el seguro, el arrendador, *a su opción*, podía obtener una cubierta de seguro en nombre del usuario y a expensas de éste.[6]

En el caso de autos, el Chase *no* optó por obtener una cubierta a nombre de la arrendataria, sino que obtuvo una cubierta supletoria en la que figuraba éste como único beneficiario. Para que el Chase hubiese renovado la cubierta, la recurrente tenía que haberlo solicitado por escrito, lo cual no hizo. *Además, la recurrente admitió y estipuló haber obviado su obligación de mantener vigente la póliza de seguro y que a la fecha del hurto el vehículo no se encontraba asegurada.* De ninguna forma la póliza obte-

---

[6] El contrato de arrendamiento financiero o *lease agreement* establecía:

"If Lessee should fail to maintain the insurance coverage required herein or to furnish Lessor with evidence thereof at the times specified, *Lessor may, at its option, obtain such required insurance coverage on behalf of Lessee and at Lessee's expense,* in which event the expense thereof shall be due and payable to Lessor on the next succeeding monthly rental payment date." (Énfasis suplido.)

nida por el Chase sustituía la obligación de la recurrente de mantener vigente su propia cubierta. *La cubierta obtenida por el Chase nunca fue a expensas de la recurrente; por el contrario, la misma fue pagada en su totalidad por el beneficiario, el Chase.*

El contrato de *leasing* en cuestión establecía, en la Cláusula 13, Apéndice, pág. 51, las circunstancias bajo las cuales la arrendataria incurriría en incumplimiento y los remedios disponibles para el arrendador.[7] *Entre los remedios disponibles, el arrendador podía optar por acelerar los cánones pendientes no pagados, opción que ejerció CNA una vez se subrogó en los derechos del Chase.*

Como expresáramos anteriormente, *en nuestra jurisdicción rige el principio de la libertad de contratación.*[8] Al interpretar un contrato tenemos que tomar en consideración el Art. 1233 del Código Civil, 31 L.P.R.A. sec. 3471, el cual señala, en lo pertinente, que "[s]i los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas". Además, nuestro Código Civil contiene una regla de hermenéutica contractual, que establece que "[l]a interpretación de las cláusulas obscuras de un contrato no deberán favorecer a la parte que hubiese oca-

---

[7] La Cláusula 13 establece, en lo pertinente:

"If during the continuance of this Lease, one or more of the following events shall occur:

"(b) Default shall be made in observance or performance of the covenants set forth in paragraph 7 hereof.

"(f) ... Lessee shall be deemed to be in default hereunder, and Lessor at its option, may thereupon terminate this Lease without further notice to Lessee .... In addition, Lessor shall be entitled to recover from Lessee all unpaid rentals from the remainder of the Term ...." Apéndice, pág. 51.

[8] El Art. 1207 del Código Civil dispone:

"Los contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral, ni al orden público." 31 L.P.R.A. sec. 3372.

sionado la obscuridad". 31 L.P.R.A. sec. 3478. Es necesario que, al interpretar el contrato en cuestión, tomemos "sus cláusulas de manera integral y no aisladamente, buscando su verdadero sentido, atendiendo a la interpretación de unas cláusulas con relación a otras". *Cervecería Corona v. Commonwealth Ins. Co.*, 115 D.P.R. 345, 348–349 (1984). Véase 31 L.P.R.A. sec. 3475.

▮▮ En el caso de autos, el contrato de arrendamiento financiero, a pesar de haber sido redactado e impreso por el Chase, es la ley entre las partes en cuanto a sus términos y condiciones. Dicho contrato, además de ser válido y contener un lenguaje claro, *no* da margen a ambigüedades *ni* a diferencias interpretativas, por lo que el mismo debe entenderse de acuerdo con sus términos. *Es preciso que tengamos en cuenta el hecho de que la aquí recurrente es abogada y no una persona lega, por lo que no desconoce la terminología y las condiciones contractuales bajo las cuales se llevan a cabo este tipo de negocios jurídicos.*[9]

Atendido lo expresado anteriormente, forzoso resulta concluir que el contrato en cuestión es válido y que no surgen confusiones interpretativas sobre la obligación de la recurrente de mantener un seguro vigente a favor del arrendador. De acuerdo con las obligaciones impuestas por el Chase en el contrato de arrendamiento financiero, la recurrente incurrió en incumplimiento de una de las cláusulas principales al haber obviado su obligación de renovar la póliza de seguros. Dicho incumplimiento facultaba al arrendador a declarar vencido el contrato de *leasing* y a acelerar los plazos restantes no pagados por la arrendataria.

---

[9] A la luz de esto, para determinar la intención de los contratantes debemos considerar " 'quiénes son las partes, haciendo particular hincapié en el conocimiento especializado, que todos o algunos de ellos pudieran tener sobre la materia objeto del contrato' ". *Unisys v. Ramallo Brothers*, 128 D.P.R. 842 (1991), citado en *Levy v. Aut. Edif. Públicos*, 135 D.P.R. 382, 390 (1994).

## III

En cuanto a la *subrogación* de CNA en los derechos adquiridos por el Chase mediante el contrato de arrendamiento financiero, entendemos que la misma procedía conforme a derecho.

El Art. 1.020 del Código de Seguros de Puerto Rico define *seguro* de la forma siguiente:

> *Seguro.*— es el contrato mediante el cual una persona se obliga a indemnizar a otra o a pagarle o a proveerle un beneficio específico o determinable al producirse un suceso incierto previsto en el mismo. 26 L.P.R.A. sec. 102.

En cuanto a la definición de *seguro de vehículos,* nuestro Código de Seguros de Puerto Rico expresa que

> ... es el seguro contra la pérdida o los daños causados a un vehículo terrestre o aeronave o cualquier animal de tiro o de montura, o de propiedad mientras estuviere en los mismos o sobre los mismos, o cargándose en los mismos o descargándose de ellos, por cualquier riesgo o causa, y contra cualquier pérdida, gastos o responsabilidad por la pérdida o los daños causados a personas o la propiedad, resultantes de la posesión, conservación, o uso de cualquiera de dichos vehículos, aeronaves o animales, o incidentales a los mismos. 26 L.P.R.A. sec. 407.

El Art. 11.060 del Código de Seguros de Puerto Rico establece, en lo pertinente, que "[c]uando en la póliza se especifica el nombre de la persona que va a asegurarse, tal seguro sólo puede aplicarse hasta el grado de su propio interés correspondiente". 26 L.P.R.A. sec. 1106.

En el caso de autos, el Chase adquirió una póliza secundaria de *excess liability or umbrella,*[10] la cual agrupaba

---

[10] La póliza de *excess liability or umbrella* se define de las maneras siguientes:

"Excess or secondary insurance is coverage that attaches only after a predetermined amount of primary coverage has been exhausted." B.R. Ostrager y T.R. Newman, *Handbook on Insurance Coverage Disputes,* Prentice Hall Law & Business, 1994, Sec. 6.03[b], pág. 207.

" ... the 'excess' policy will provide coverage only for liability above the maximum coverage of the primary policy or policies ... excess insurer would be liable once

lós vehículos arrendados —sin particular designación— en su división de *leasing* de modo que pudiera proteger su interés económico.([11]) Dicha póliza nombraba exclusivamente al Chase como asegurado. Por su parte, cada arrendatario tenía la obligación de mantener una póliza primaria en la que el arrendador fuese beneficiario y que la misma cubriera el beneficio económico tanto del arrendador como del usuario. En este caso la arrendadora no renovó la póliza principal, por lo que la cubierta secundaria o de exceso —obtenida por el Chase— tuvo que responderle a su asegurado por la pérdida de la unidad arrendada, obligación que en primera instancia le correspondía al seguro de la usuaria que era el requerido en el contrato de *leasing*.

Por otro lado, la póliza de exceso expedida a nombre del Chase disponía claramente —en el endoso "D"— que *no cubría el interés de ningún arrendatario* ya que los contratos de *leasing* requieren que el arrendatario adquiera una cubierta principal. Esta cláusula excluye expresamente la posibilidad de que un arrendatario reclame como "asegurado" bajo los términos de dicha cubierta. Además, dicho endoso "D" dispone que:

> Una reclamación con arreglo a este endoso tiene lugar en caso de accidente, *cuando el arrendatario no ha adquirido la cubierta correspondiente* o cuando la póliza adquirida ha sido anulada. La Compañía *adquirirá todos los derechos* conferidos al Chase Manhattan Bank *en virtud de su "contrato" con el arrendatario*.([12]) (Traducción y énfasis nuestros.)

---

the policy limits of the primary insurer had been exhausted." (Escolios omitidos.) 8A *Appleman, Insurance Law and Practice* Sec. 4909 (1981).

([11]) A estos efectos, la póliza de seguro establece en el encasillado destinado para la descripción del vehículo asegurado lo siguiente:
"COVERS ALL VEHICLES LEASED BY CHASE MANHATTAN BANK, N.A. THROUGH THEIR LEASING DIVISION." Apéndice, pág. 32.

([12]) "THIS INSURANCE DOES NOT COVER THE INTEREST OF ANY LESSEE....
"A CLAIM UNDER THIS ENDORSEMENT IS TRIGGERED BY AN ACCIDENT WHERE THE LESSEE FAILED TO OBTAIN COVERAGE OR WHERE THE POLICY OBTAINED HAS BEEN MADE NULL AND VOID. THE COMPANY WILL BE ENTITLED TO ALL OF THE RIGHTS VESTED WITH THE CHASE MANHATTAN BANK AS THE RESULT OF ITS 'CONTRACT' WITH THE LESSEE." Apéndice, pág. 37.

 No es la primera vez que nos hemos expresado *respecto a la subrogación a favor del asegurador.* En el caso *Aseg. Lloyd's London v. Cía. Des. Comercial,* 126 D.P.R. 251, 267 (1990), expresamos que "en los contratos de seguro se transfiere el riesgo a la aseguradora y surge una obligación por parte de ésta de responder por los daños económicos al asegurado de ocurrir el evento. Al resarcir económicamente al asegurado, la compañía aseguradora se pone en la posición de éste en relación a todas las acciones y remedios a los cuales tiene derecho. Ocurre lo que llamamos 'el derecho a la subrogación' ".[13] Recientemente, en el caso *Coop. Seguros Múltiples de P.R. v. Lugo,* 136 D.P.R. 203, 211 (1994), expresamos que " '[l]a subrogación es el derecho del asegurador a situarse en la posición del asegurado para gestionar —contra terceras partes legalmente responsables— al asegurado el recobro de una pérdida o daño pagado por el asegurador' ". (Énfasis suprimido.)

Con relación a la subrogación de la aseguradora, *en los derechos adquiridos por el asegurado mediante el otorgamiento de contratos con terceros,* el profesor Couch indica que cuando el asegurado ha entrado en un contrato con terceras partes —bajo términos en los que los terceros contratantes se hacen responsables a dicho asegurado por la pérdida o daños a la propiedad asegurada— *el asegurador, una vez efectúe el pago por la pérdida, tendrá derecho a subrogarse en los derechos del asegurado bajo el contrato con los terceros.*[14]

De acuerdo con los términos de la cubierta de exceso adquirida por el Chase, una vez CNA indemnizara a su asegurado por la pérdida de cualquiera de las unidades

---

[13] Con relación a la subrogación, se ha comentado:

"An insurer has the right to recover, by way of subrogation, for damages that it has been called upon to pay to an insured under its policy. The subrogation of an indemnity insurer arises by operation of law when it makes payment to the insured, that is, the payment of an obligation by a surety ordinarily entitles him to subrogation of all the rights, remedies, and equities of the obligee." (Escolios omitidos.) 16 *Couch on Insurance 2d (Ed. rev.)* Sec. 61:4, págs. 77–78 (1983).

[14] *Couch,* supra, Sec. 61:147.

aseguradas, ésta tenía derecho a subrogarse en los derechos que el Chase hubiese adquirido en virtud de los contratos de *leasing*. No obstante, dicha cubierta en exceso respondería sólo en aquellos casos en que una vez agotados los límites de la cubierta principal —del usuario— existiesen cantidades pendientes de indemnizar.

En el caso de autos al no existir una cubierta principal que le respondiera al arrendador por la pérdida de la unidad arrendada, la cubierta de exceso tuvo que indemnizar por dicha pérdida. Una vez CNA indemnizó al Chase por la pérdida del vehículo arrendado a la recurrente, éste ejerció, de acuerdo con la cubierta, su derecho de subrogarse en los derechos adquiridos por el arrendador mediante el contrato. Por su parte, una vez subrogado en los derechos del Chase, CNA requirió de la recurrente el pago de las rentas pendientes no pagadas, las cuales representaban la cantidad a ser cobrada por el término del arrendamiento y no por el valor real del vehículo. *La reclamación válidamente respondía al incumplimiento de la arrendataria de no mantener vigente la póliza de seguro que garantizaba al Chase, en primera instancia, y al interés económico de su industria financiera.* Por todo lo discutido anteriormente, entendemos que la subrogación de CNA en los derechos adquiridos por el Chase mediante el contrato de *lease* procedía contra la parte que incumplió dicho contrato.

## IV

Finalmente, la recurrente alega que no procedía la imposición de honorarios de abogado por temeridad. Entendemos que dicho error tampoco fue cometido por el tribunal de instancia.

▮ Hemos expresado que la determinación del tribunal de instancia sobre si procede el pago de honorarios de abogado *por temeridad* es discrecional. *Asociación de Condóminos v. Trelles Reyes*, 120 D.P.R. 574, 579 (1988). Dicha

determinación no será revisada por este Tribunal a menos que se haya cometido un abuso de discreción por parte del tribunal sentenciador. *San Miguel Fertil. Corp. v. P.R. Drydock*, 94 D.P.R. 424 (1967); *Montañez Cruz v. Metropolitan Cons. Corp.*, 87 D.P.R. 38, 40 (1962). Le corresponde a la parte recurrente demostrar la comisión, por el tribunal sentenciador, del abuso de discreción. *Elba A.B.M. v. U.P.R.*, 125 D.P.R. 294 (1990). La recurrente así no lo ha demostrado.

En el presente caso tenemos la situación adicional específica de que el contrato de arrendamiento financiero establecía claramente, en la Cláusula 13, la obligación del arrendatario de pagar los honorarios de abogado si iniciaba una acción judicial por razón de incumplimiento. No procede que intervengamos con la referida determinación; mucho menos cuando la concesión de honorarios está fundada, adicionalmente, en el contrato suscrito por las partes.

*Se dictará sentencia de conformidad.*