Rodríguez de Oronoz, Jueza Ponente
TEXTO COMPLETO DE LA SENTENCIA
Se nos solicita la revisión de una sentencia del Tribunal de Primera Instancia, Sala Superior de San Juan, emitida el 4 de agosto de 2000, declarando con lugar la demanda presentada en este caso y ordenándole a la apelante pagar la suma principal de $134,813.00, más los intereses pactados de 10.625% desde que debió haber *1127 pagado la deuda, más las costas del procedimiento y la suma de $6,000.00 de honorarios de abogado.
Examinados en su totalidad los autos del caso y el derecho aplicable, resolvemos confirmar la sentencia apelada.
I
El 22 de febrero de 1995, los demandantes, José A. Matos Matos, Carmen Luz Borges García y la Sociedad Legal de Gananciales compuesta por ambos (“los demandantes”), presentaron una demanda sobre ejecución de hipoteca por la vía ordinaria contra la Iglesia de Dios Mission Board, Inc. (“IGLESIA”). Alegaron que el 14 de mayo de 1992, el Reverendo Manuel Pérez Sánchez, en representación de la IGLESIA, firmó un pagaré hipotecario por la cantidad de $215,000.00. Sostuvieron que la IGLESIA no había satisfecho el pago del pagaré a la fecha de su vencimiento ni de sus intereses desde el 14 de mayo de 1992, a pesar de haberle sido requerido el mismo. Solicitaron que se declarara con lugar la demanda afirmando que la IGLESIA les adeudaba la suma principal de $215,000.00, más intereses pactados al 10.625%, costas y una suma mínima del quince por ciento (15%) del principal para honorarios de abogado. También se le suplicó al tribunal que ordenara al alguacil proceder con la venta de la propiedad que garantizaba el pagaré. Copia del pagaré se unió y se hizo formar parte de la demanda. (Apéndice, pág. 4)
Según los términos de dicho pagaré, la IGLESIA se obligó al pago del principal más intereses al 10.625%. Los intereses se pagarían en mensualidades vencidas de $1,903.65, comenzando treinta (30) días después de firmado el pagaré y hasta el pago total y definitivo del principal. El tenedor del pagaré podía proceder con la ejecución del mismo de faltar el pago de dos mensualidades consecutivas. En caso de reclamación judicial, la IGLESIA se obligó al pago de todas las costas, gastos del procedimiento y una suma equivalente al quince por ciento (15%) del principal para honorarios de abogado. También se acordó que no operaría en beneficio de los deudores el derecho a compensación.
Para garantizar el pagaré, en esa misma fecha, la IGLESIA otorgó una hipoteca sobre un inmueble del cual era titular en pleno y absoluto dominio, localizado en la Calle Hipódromo número 19, Santurce, Puerto Rico, mediante la escritura pública número 45 ante el notario José González González. En caso de ejecución de hipoteca, las partes pactaron un tipo mínimo de $250,000.00 en la subasta judicial.
En su contestación a la demanda, la IGLESIA incluyó una reconvención alegando que la parte demandante no era un tenedor de buena fe y que servía a los propósitos fraudulentos de la Santurce Mortgage Broker Corporation (“SANTURCE'), empresa con la que la IGLESIA tramitó un préstamo hipotecario. Además, argüyó que el contrato de préstamo hipotecario estaba sujeto a un contrato de construcción entre la IGLESIA y The Martin Home Group Corp. (“MARTIN') para la construcción de un templo sobre una estructura de acero que se había edificado en el solar propiedad de la IGLESIA, sitó en la Calle Hipódromo en Santurce, Puerto Rico, y acompañó copia de dicho contrato (Apéndice, págs. 136-139). La IGLESIA también presentó una demanda de tercero contra SANTURCE y contra MARTIN, la cual fue posteriormente enmendada.
En el contrato de construcción y relevo de responsabilidad otorgado en junio de 1992, comparecieron las siguientes partes: la IGLESIA como “el contratante”, MARTIN como “el contratista”, SANTURCE como “el tramitante y depositario” y José Alberto Matos Matos como “el acreedor hipotecario”. En dicho contrato se especificó que la IGLESIA seleccionó libremente a MARTIN para que efectuara la construcción pactada “sin que la misma haya intervenido ni tenga responsabilidad alguna de SANTURCE MORTGAGE BROKERS, ni del ACREEDOR HIPOTECARIO”. Además, en el párrafo quinto del contrato se estipuló lo siguiente:
“ — QUINTO: Que ‘El Contratante ’ autoriza a Santurce Mortage Brokers a mantener en depósito el dinero tomado en préstamo, el cual ha sido tramitado por Santurce Mortgage Brokers, para desembolsarlo a tenor con las condiciones de este contrato al ‘contratista’. ”
*1128 En las cláusulas dos, tres y cuatro del contrato, se acordó que la IGLESIA le pagaría a MARTIN la suma de $174,700.00 por la construcción total de la estructura en cuestión, que la construcción se llevaría a cabo en etapas, que SANTURCE le haría pagos específicos a MARTIN a la culminación de .cada etapa y. que SANTURCE retendría un diez por ciento (10%) de las cantidades a pagar “para responder al fiel cumplimiento por parte del CONTRATISTA de todas sus obligaciones bajo este contrato”. Las etapas de construcción pactadas fueron:
“ — PRIMERA ETAPA: Al firmar contrato de construcción

—SEGUNDA ETAPA: Al fundir losa de piso-segundo nivel

—TERCERA ETAPA: En la elevación de bloques-segundo nivel

—CUARTA ETAPA: Al fundir losa de piso-tercer nivel

—QUINTA ETAPA: Al terminar la obra”

Los pagos a MARTIN se pactaron como sigue:

“PRIMERA ETAPA : $33,913.00

SEGUNDA ETAPA : $33,913.00

TERCERA ETAPA : $33,913.00

CUARTA ETAPA : $33,913.00

QUINTA ETAPA : $39,048.00”
En la cláusula cinco del contrato de construcción se dispuso:
“ — CINCO: Que en el día de hoy y por el presente documento, “El Contratante” nombra y “El Contratista” acepta a SANTURCE MORTGAGE BROKERS como entidad depositaría de los fondos que ha obtenido del préstamo hipotecario, para que los custodie y efectúe pagos parciales según se han concluido y aprobado las etapas construidas por “El Contratista”. “El Contratante” emitirá autorizaciones de paga para cada una de las etapas de la construcción según éstas vayan siendo terminadas a fin de que SANTURCE MORTGAGE BROKERS efectúe dichos pagos parciales a “El Contratista ”. ”
La cláusula seis del contrato señalaba que ni SANTURCE ni el.ACREEDOR HIPOTECARIO tendría obligación de clase alguna de supervisar el cumplimiento de las leyes relacionadas con la construcción en cuestión. La cláusula siete estipulaba que si MARTIN incumplía con lo pactado, “el ACREEDOR HIPOTECARIO, ÉANTUCE MORTAGE BROKERS y/o ‘el Contratante’ podrán, a su opción, proceder contra ‘El Contratista’ para recobrar la totalidad del dinero desembolsado hasta entonces, más las costas, gastos y honorarios de abogados en que se incurra”. Se estableció en la cláusula nueve que: .. ..
“ — NUEVE: “El Contratante” acepta, admite y manifiesta que las únicas funciones dé SANTURCE MORTGAGE BROKERS han sido facilitar la tramitación del financiamiento de la obra a construirse, ejerciendo las funciones normales de un corredor de préstamos hipotecarios, actuar como depositario y efectuar desembolsos a “El Contratista” y de ninguna manera ha promovido ni participado en la construcción de la referida obra. “El Contratante” acepta, admite y manifiesta que las únicas funciones del ACREEDOR HIPOTECARIO, han sido el financiar la obra a construirse y de ninguna manera ha promovido ni participado en la construcción de la obra. ”
*1129 A tenor con lo dispuesto en la cláusula antes citada, la IGLESIA acordó en la cláusula diecisiete relevar de responsabilidad en forma total, absoluta e irrevocable a SANTURCE y al ACREEDOR HIPOTECARIO o a cualquier tenedor posterior del pagaré hipotecario por cualquier incumplimiento de parte de MARTIN y por cualquier defecto o vicio de construcción, daños y perjuicios, o por cualquier otra causa. En la cláusula trece, la IGLESIA se obligó a pagar cualquier diferencia que pudiera existir entre el balance neto del préstamo y el costo de construcción de la propiedad. Además, en la cláusula once se estipuló:
“ — ONCE: EL PERMISO DE USO y la ACEPTACION del trabajo realizado por parte del “Contratante" son requisitos indispensables para el desembolso de la ULTIMA ETAPA. ”
El 25 de junio de 1992, la IGLESIA contrató los servicios de MARTIN para la construcción o ampliación de una estructura por valor de $174,700.00 (Apéndice, págs. 158-160). De acuerdo al inciso A de ese contrato, la obra sería terminada a los 240 días laborables de empezada la misma. Mediante el inciso K se estableció la siguiente forma de pago:

“Al finalizar el contrato de construcción: $33,913.00

Al fundir losa de piso-segundo nivel: $33,913.00

En la elevación de bloques-segundo nivel: $33,913.00

Al fundir losa de piso-tercer nivel: $33,913.00

En la elevación de bloques-tercer nivel: $33,913.00

Al terminar la obra: $5,135.00”

Durante el descubrimiento de prueba, SANTURCE ofreció unos 169 cheques cancelados y 12 comprobantes para evidenciar las sumas alegadamente desembolsadas tanto a MARTIN como a suplidores de materiales, relacionados con la construcción contratada por la IGLESIA, los cuales fueron marcados como Exhibit 5. Concluido el descubrimiento de prueba, el 31 de mayo de 1996, se celebró una vista evidenciaría limitada a oír prueba sobre el dinero real y efectivamente desembolsado por SANTURCE para abonar a MARTIN. Mediante el testimonio del Sr. Raúl Monteagudo González, Presidente de SANTURCE, se aclaró el contenido del Exhibit 5 de dicha parte.
Luego de varios incidentes procesales, el 4 de agosto de 2000, el tribunal de instancia emitió la sentencia apelada. En la misma, el tribunal declaró con lugar la demanda de ejecución de hipoteca, desestimó la reconvención y condenó a la IGLESIA a pagar a la parte demandante la suma principal de $134,813.00. El tribunal resolvió que el pagaré hipotecario por $215,000.00 se otorgó con el propósito de garantizar el pago de un préstamo de contrato de construcción por la suma de $174,700.00, el cual se desembolsaría por etapas a medida que progresara la construcción. Determinó ver en conjunto el pagaré hipotecario y el contrato de construcción para interpretar el alcance del negocio pactado entre las partes. Concluyó que de la prueba desfilada surgía que SANTURCE sólo había desembolsado $134,813.00 mediante trece (13) cheques a favor de MARTIN, nueve (9) de ellos girados por SANTURCE y cuatro (4) por International Property Investment Group. El tribunal, además, condenó al pago de los intereses pactados de 10.625% desde que debió haber pagado la deuda, de las costas y a la suma de $6,000.00 de honorarios de abogado.
Inconforme, la IGLESIA presentó escrito de apelación ante este Tribunal y planteó los siguientes errores:

“ERRO EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE SAN JUAN, AL ADMITIR COMO EVIDENCIA NO CONTROVERTIDA LOS CHEQUES ENUMERADOS DEL 10 AL 13, CONTENIDOS EN EL EXHIBIT 5-A Y AL DETERMINAR QUE LA CANTIDAD PRINCIPAL ADEUDADA 
*1130
POR IGLESIA ASCENDIA A $134,813.00.

ERRO EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA,. SALA SUPERIOR DE SAN JUAN, AL NEGARSE ACREDITAR A LA DEUDA RECLAMADA LA SUMA DE $22,000.00 ENTREGADO POR IGLESIA A SANTURCE.

ERRO EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE SAN JUAN, AL IMPONERLE A IGLESIA EL PAGO DEL INTERES DEL 10.625% ANUAL, EN LUGAR DEL INTERES LEGAL.

ERRO EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE SAN JUAN, AL IMPONERLE A IGLESIA EL PAGO DE LA SUMA DE $6,000.00 POR CONCEPTO DE HONORARIOS DE ABOGADO. ”
II
En los primeros dos errores, en esencia, la IGLESIA cuestiona la apreciación que de la prueba hiciera el Tribunal de Primera Instancia. Por lo tanto, lo que propiamente nos corresponde evaluar es si la prueba sostiene las determinaciones de hechos del tribunal.
Es norma reiterada en nuestra jurisdicción que la apreciación de la prueba efectuada por el tribunal sentenciador goza de gran respeto y deferencia, ya que éste tuvo la oportunidad de observar a los testigos mientras declaraban y apreciar su “demeanor”. Por ello, es un principio cardinal que los foros apelativos no intervendrán con la apreciación de la prueba desfilada o con la adjudicación de credibilidad que hizo el juzgador de los hechos, en ausencia de pasión, prejuicio, parcialidad o error manifiesto. Trinidad v. Chade,_D.P.R. _(2001), 2001 J.T.S. 10; Rolón García v. Charlie Car Rental, Inc.,_D.P.R._(1999), 99 J.T.S. 89; Belk v. Martínez,_D.P.R._(1998), 98 J.T.S 92; Mercado, Quilichini v. U.C.P.R., 143 D.P.R. 610 (1997); López Vicil v. I.T.T. Intermedia, Inc., 143 D.P.R. 574 (1997); Quiñones López v. Manzano Pozas, 141 D.P.R. 139 (1996); Monllor v. Soc. de Gananciales, 138 D.P.R. 600 (1995); Levy v. Aut. Edif. Públicos, 135 D.P.R. 382 (1994); Vélez v. Srio. de Justicia, 115 D.P.R. 533 (1984).
De otro lado, un tribunal no viene obligado a incluir en su sentencia las determinaciones de hechos que no encontró probadas o que son irrelevantes a su resultado. La prueba de las partes la considera el tribunal en su totalidad y en la decisión dirime cualquier controversia o contradicción que surja de ella. No se trata de hacer una recapitulación de la prueba y no se requieren detalles innecesarios. Basta expresar aquéllos que son necesarios para fundamentar su sentencia. Cuevas Segarra, Práctica Procesal Puertorriqueña, Publicaciones J. T.S., Inc., 1979, Yol. II, págs. 226-229.
Como primer error, la IGLESIA cuestiona el que se admitieran en evidencia cuatro cheques contenidos en el Exhibit 5-A de la tercera demandada SANTURCE y, en consecuencia, determinara que la cantidad adeudada por ésta a la parte demandante ascendía a $134,813.00. En su segundo señalamiento de error, la IGLESIA cuestiona el que no se le acreditara al principal adeudado la suma de $22,000.00, que ésta le entregó a SANTURCE.
Los documentos objetados por la IGLESIA, en el primer error, formaron parte de 169 cheques cancelados y doce (12) comprobantes presentados por SANTURCE como evidencia de los desembolsos hechos a MARTIN relacionados con la construcción del templo, según pactado en el contrato de construcción otorgado entre IGLESIA y MARTIN. Surge de los autos que al analizar el contenido del Exhibit 5 de SANTURCE, el juzgador de los hechos lo dividió en tres grupos que identificó como Exhibits 5-A, 5-B y 5-C, a saber: (1) los trece (13) cheques girados tanto por SANTURCE como por International Property Investment Group a favor de MARTIN que ascendían a la suma de $134,813.00 fueron marcados como Exhibit 5-A. Véase Determinaciones de Hechos m y n. (Apéndice, págs. 239-240); (2) los 156 cheques girados por International Property Investment *1131 Group a nombre de terceras personas que ascendían a $58,049.82 fueron marcados Exhibit 5-B (Apéndice, pág.88); y (3) el grupo de documentos consistente de comprobantes de cheques y fotocopias de cheques que ascendían a $3,799.30 fueron marcados Exhibit 5-C (Apéndice, pág. 88). La IGLESIA solamente cuestionó la validez de los pagos a terceros realizados sin su aprobación, es decir, los documentos identificados como Exhibits 5-B y 5-C de SANTURCE. (Apéndice, pág. 87).
De esa prueba documental, al tribunal le mereció credibilidad los cheques contenidos en el Exhibit 5-A y determinó que sólo se demostró que SANTURCE desembolsó a MARTIN la suma de $134,813.00, aun cuando la IGLESIA había aprobado el pago de cuatro certificaciones montantes a $135,652.00. Véase Determinaciones de Hechos u y v (Apéndice, pág. 244). La prueba aportada por la parte demandante consistente en los documentos contenidos en los Exhibits 5-B y 5-C, no le mereció credibilidad al tribunal, razón por la cual resolvió que no quedó demostrado que SANTURCE le entregó a la IGLESIA el importe de $39,887.00 para completar el pago del contrato de construcción. Por consiguiente, resolvió que la parte demandante estaba impedida de reclamarle a IGLESIA dicha suma, aun cuando apareciera que la totalidad de la deuda estaba garantizada por la hipoteca. Véase Conclusiones de Derecho (Apéndice, págs. 244-248).
En su alegato, la IGLESIA arguye que durante la vista evidenciaría del 31 de mayo de 1996, su abogado objetó los cheques expedidos por International Property Investment Group por ser prueba impertinente e inmaterial pues se trataba de pagos realizados por un tercero que no fue parte en el contrato de construcción y relevo otorgado entre IGLESIA y MARTIN. Tal argumento no tiene ninguna validez jurídica.
El Artículo 1112 del Código Civil, 31 L.P.R.A. § 3162, dispone que “[p]uede hacer el pago cualquier persona, tenga o no intereses en el cumplimiento de la obligación, ya lo conozca y lo apruebe, o ya lo ignore el Deudor”. En términos generales, el pago puede verificarse por cualquier persona no incapaz, sea cual fuere su interés en la obligación, y aun cuando en ella no tenga absolutamente ninguno, ni relación anterior al pago con los obligados. Bonilla v. Citibank, 116 D.P.R. 705 (1985), citando a J. M Manresa, Comentarios al Código Civil Español, 6ta ed. Rev., Madrid, Ed. Reus, 1967, T. VIII, Vol. 1, pág. 599.
Su discusión del error se limita al valor probatorio de los cuatro cheques emitidos por International Property Investment Group a tenor con lo dispuesto en la Regla 18 de Evidencia. Alega que se trata de prueba de un grado menor a la que razonablemente se hubiera esperado y a la evidencia del Exhibit 5-A porque “se trata de pagos hechos al Contratista, pero por una entidad que no es parte del contrato". No tiene razón.
La prueba objetada por la IGLESIA era evidencia pertinente y material. Se trataba de cuatro cheques emitidos a MARTIN como pagos parciales relacionados con la construcción contratada entre la IGLESIA y MARTIN. En la vista evidenciaría se presentaron los originales cancelados de dichos cheques emitidos a MARTIN a través del testimonio del Sr. Monteagudo, Presidente de SANTURCE. Durante su testimonio y a preguntas tanto del abogado de la IGLESIA como del tribunal, el Sr. Monteagudo identificó a International Property Investment Group como “una compañía de inversiones que hacen los inversionistas pa ’ los efectos de administrar estos fondos...”, (Transcripción de la vista, pág. 143, líneas 14-16); que “se dedica a darle servicio a base de esto, mire a computar los intereses y en ocasiones a dar desembolsos también sin problema alguno... ”, (Transcripción, pág. 145, líneas 4-6); y que dicha entidad da servicio como “[p]or ejemplo, el cobro de hipoteca, la administración del ‘portfolio’, la contabilidad...", (Transcripción, pág. 147, líneas 22-23). Surge de la sentencia apelada que los cheques fueron autenticados, admitidos en evidencia y le merecieron total credibilidad al juzgador de los hechos, a pesar de las objeciones levantadas por el abogado de la IGLESIA.
No surge de los autos que la IGLESIA hubiera presentado prueba que pudiera controvertir esa evidencia como, por ejemplo, el testimonio de un representante de MARTIN, entidad que recibió los pagos y que para ese entonces era una tercera co-demandanda, a los efectos de que los pagos evidenciados por los cheques objetados no estaban relacionados con la construcción pactada por la IGLESIA y MARTIN. Con la prueba desfilada que le mereció credibilidad, el tribunal de instancia encontró demostrado que los cuatro cheques en cuestión *1132 representaban desembolsos al contratista en consonancia con los acuerdos pactados. Este Tribunal no está en posición de sustituir el criterio de quien pudo aquilatar la prueba testifical de primera mano por el suyo propio.
El segundo error señalado tampoco se cometió. La IGLESIA argumenta que a pesar de que el tribunal de instancia adjudicó el hecho de que “Santurce le exigió a la Iglesia la entrega de $22,000.00 los cuales sta última le entregó a la primera”, no le acreditó dicho pago a lo desembolsado, reduciendo así la cuantía principal de la sentencia. Sostiene además que “los demandantes no aportaron prueba alguna para justificar porqué ellos o SANTURCE retuvieron dicha cantidad”. Concluye que en vista de ello y ante el reclamo de IGLESIA, “procede se aplique el principio de la compensación en este caso o que se considere el pago de los $22,000.00 como un pago adelantado hecho por IGLESIA. ”
Ciertamente, el tribunal de instancia, como cuestión de hecho, determinó que SANTURCE le exigió a la IGLESIA la entrega de la suma de $22,000.00, los cuales la IGLESIA entregó a SANTURCE. No obstante, la IGLESIA obvia mencionar que el tribunal de instancia también determinó que tanto, la exigencia hecha por SANTURCE como el pago de los $22,000.00 realizado por la IGLESIA ocurrieron “con anterioridad a la fecha en que se otorgaron los contratos de préstamo, pagaré y escritura de constitución de hipoteca y el ‘Contrato de Construcción y Relevo de Responsabilidad’”. Véase Determinaciones de Hechos r (Apéndice, pág. 241). Además, surge de los autos que existe una ausencia total de prueba que vincule a la parte demandante con el pago de los $22,000.00 o de que ésta se benefició en todo en parte de ese pago.
En cuanto al planteamiento de la IGLESIA de que se debió aplicar el principio de compensación, tampoco procede. La compensación es una de las formas que señala el Código Civil de Puerto Rico para extinguir una obligación. Art. lili del Código Civil, 31 L.P.R.A. § 3151. La compensación tiene lugar cuando dos personas por derecho propio sean recíprocamente acreedoras y deudoras la una de la otra. Art. 1149 del Código Civil, 31 L.P.R.A. § 3221. Dicha figura se usa para simplificar las relaciones jurídicas entre aquéllos que están recíprocamente obligados. Walla Corp. v. Banco Com. de Mayagüez, 114 D.P.R. 216 (1983).
La compensación procede cuando se cumple con los siguientes requisitos:

“(1) Que cada uno de los obligados lo esté principalmente, y sea a la vez acreedor principal del otro.

(2) Que ambas deudas consistan en una cantidad de dinero, o siendo fungibles las cosas debidas, sean de la misma especie y también de la misma calidad, si ésta se hubiese designado.

(3) Que las dos deudas estén vencidas.

(4) Que sean líquidas y exigibles.

(5) Que sobre ninguna de ellas haya retención o contienda promovida por terceras personas y notificada oportunamente al deudor. ’’

Art. 1150 del Código Civil, 31 L.P.R.A. § 3222.
Sin embargo, en el presente caso, el principio de compensación no es de aplicación, pues no está presente el primer requisito antes mencionado. Más importante aún, en el último párrafo del pagaré hipotecario se acordó que “[njo operará en beneficio de los deudores el derecho a compensación". Es decir, existía una prohibición contractual que impedía la aplicación del principio de compensación.
Un examen detenido y minucioso de toda la prueba que obra en el expediente ante nos, así como de la transcripción de la vista evidenciaría del 31 de mayo de 1996, nos convence de que dicho tribunal no erró en su apreciación de la prueba testifical y documental.
*1133 III
Discutiremos el tercer y cuarto error en conjunto, por entender que están relacionados.
En su tercer señalamiento de error, la IGLESIA sostiene que el interés aplicable en este caso era el interés legal prevaleciente y no el interés de 10.625% concedido por el tribunal de instancia. Para fundamentar tal alegación, sostiene que el tribunal de instancia determinó que el pagaré hipotecario garantizaba el préstamo de construcción y que como las partes no pactaron sobre la tasa de interés aplicable a dicho préstamo, procedía que se aplicara la tasa de interés legal que dispone el Artículo 1649 del Código Civil, 31 L.P.R.A. § 4591. Como cuarto error señala que se le imputó a la IGLESIA una actuación temeraria al imponérsele el pago de $6,000.00 por concepto de honorarios de abogado. Argumenta que mediante su oportuna intervención y diligencia a través de todo el proceso, logró que la cantidad que venía obligada a pagar se redujera de los $215,000.00 originalmente reclamados en la demanda sobre ejecución de hipoteca a la suma de $134,813.00. Por ello, entiende que no procedía la concesión de honorarios de abogado. No tiene razón la IGLESIA.
A pesar de que el tribunal de instancia determinó que el pagaré hipotecario estuvo condicionado a lo dispuesto en el contrato de construcción y que ambos documentos había que tomarlos en conjunto para determinar e interpretar el alcance de las obligaciones y del negocio pactado entre las partes, éste concluyó que la hipoteca garantizaba el importe prestado. El Tribunal de Primera Instancia también concluyó que la IGLESIA, como deudora hipotecaria, respondía de la hipoteca, pero reducida la misma a la suma evidenciada mediante la prueba presentada y que le mereció credibilidad, es decir, $134,813.00.
En nuestro ordenamiento jurídico, “[l]as obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes y deben cumplirse al tenor de los mismos. ” Artículo 1044 del Código Civil, 31 L.P.R.A. § 2994. Así también, los contratantes pueden establecer las condiciones que tengan por conveniente, siempre que no sean contrarias a las leyes, a la moral o al orden público. 31 L.P.R.A. § 3372. Según el Artículo 1206 de nuestro Código Civil, 31 L.P.R.A. § 3371, “[e]l contrato existe desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa, o prestar algún servicio.” Una vez es perfeccionado el contrato, éste obliga tanto al cumplimiento de lo expresamente pactado, como a todas las consecuencias que sean conformes con la buena fe, el uso y la ley. Artículo 1210 del Código Civil, 31 L.P.R.A. § 3375; Ramírez v. Club Cala de Palmas, 123 D.P.R. 347, 348 (1989). Es principio reiterado que si los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, regirá el sentido literal de sus cláusulas. 31 L.P.R. A. § 3471; CNA Casualty of P.R. v. Torres Díaz, 141 D.P.R. 27 (1996). La jurisprudencia estima por términos claros aquéllos que por sí mismos son bastante lúcidos para ser entendidos en un único sentido, sin dar lugar a dudas, controversias ni diversidad de interpretaciones y sin necesitar para su comprensión, razonamientos o demostraciones susceptibles de impugnación. Sucn. Ramírez v. Tribunal Superior, 81 D.P.R. 357 (1959).
Como se desprende de la sentencia apelada, en ningún momento el tribunal de instancia declaró nulo el pagaré hipotecario. Por lo tanto, lo allí pactado era la ley entre las partes. Los términos del pagaré eran claros y no dejaban duda sobre la intención de las partes. No sólo se pactó el interés al 10.625%, sino que también se pactó que “en caso de reclamación judicial, los deudores pagarán, todas las costas y gastos del procedimiento y una suma mínima, equivalente al quince por ciento (15%) del principal de esta obligación para honorarios de abogados...”. Una vez se perfeccionó el contrato, la IGLESIA estaba obligada al cumplimiento de lo expresamente pactado en el pagaré hipotecario, es decir, al pago de intereses al 10.625% y al pago de honorarios de abogado.
En este caso, el tribunal de instancia estimó razonable conceder la suma de $6,000.00 por concepto de honorarios de abogado y la parte demandante se allanó a tal determinación. De hecho, en la deposición que se le tomara al Sr. Matos el 13 de noviembre de 1997, éste admitió que el negocio entre las partes era realmente un préstamo de construcción. Los tribunales de justicia no pueden relevar a una parte de cumplir con lo que se obligó a hacer mediante contrato cuando dicho contrato es legal y válido y no contiene vicio alguno. Olazábal v. U.S. Fidelity, etc., 103 D.P.R. 448, 462 (1975). Por consiguiente, este Tribunal no eximirá a la IGLESIA del *1134 pago de los intereses al tipo de 10.625% y de los honorarios de abogado concedidos.
IV
Por los fundamentos expresados, se confirma la sentencia apelada.
Así lo acordó y manda el Tribunal y lo certifica la Secretaria General.
Aida Ileana Oquendo Graulau
Secretaria General
ESCOLIO 2002 DTA 72
1. Cabe señalar que anterior a esta sentencia, el Tribunal de Primera Instancia había emitido una sentencia parcial el 9 de agosto de 1996, la cual fue dejada sin efecto el 19 de mayo de 1997. Posteriormente, el tribunal de'ifistancia emitió una sentencia final el 17 de agosto de 1999, cuya reconsideración fue acogida el 21 de abril de 2000, posterior a la cual se emitió la sentencia enmendada que es objeto de la presente apelación.