

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| José A. Andréu Fuentes y otros<br><br>        Recurridos<br><br>                v.<br><br>Popular Leasing, Inc. Y otros<br><br>        Peticionarios | Certiorari<br><br>2012 TSPR 31<br><br>184 DPR \_\_\_\_ |

Número del Caso: CC-2008-726

Fecha: 16 de febrero de 2012

Tribunal de Apelaciones:

        Región Judicial de San Juan

Jueza Ponente:

        Hon. Emmalind García García

Abogados de la Parte Peticionaria:

        Lcdo. David López Pumarejo
        Lcda. Juliette Donato Bofill
        Lcda. Nubia Z. Díaz Figueroa

Abogados de la Parte Recurrida:

        Lcdo. Harold D. Vicente
        Lcdo. Pedro J. López Bergollo

Materia: Saneamiento por Vicios Ocultos; Rescinsión de Contrato; Daños y Perjuicios

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| JOSÉ A. ANDRÉU FUENTES Y OTROS<br><br>RECURRIDOS<br><br>v.<br><br>POPULAR LEASING, INC. Y OTROS<br><br>PETICIONARIOS | Núm.: **CC-2008-0726** | *Certiorari* |

Opinión del Tribunal emitida por el Juez Asociado señor Feliberti Cintrón

En San Juan, Puerto Rico, a 16 de febrero de 2012.

En el presente recurso tenemos la oportunidad de aclarar y profundizar sobre una controversia novel que surge dentro de los parámetros de la institución legal del contrato de arrendamiento financiero, comúnmente conocido como *leasing*. En particular, debemos resolver si en caso de incumplimiento de un contrato de arrendamiento financiero, la entrega del bien objeto del contrato debido a desperfectos mecánicos —de los cuales el arrendador ha quedado totalmente relevado, y que además se han transferido al arrendatario todas las garantías que el arrendador tuviese con el suplidor respecto al funcionamiento adecuado del vehículo— compensa adecuadamente al arrendador de su riesgo e inversión en

relación a la responsabilidad del arrendatario por el incumplimiento o resolución unilateral del contrato.

## I

En octubre de 2000, José A. Andréu Fuentes (Sr. Andréu o el recurrido) decidió adquirir un vehículo para su uso personal, marca Audi, modelo A6 del año 1998, que vendía el proveedor de automóviles JP Motors, Inc. (JP Motors). El Sr. Andréu optó por financiar el vehículo a través de un arrendamiento financiero abierto otorgado con Popular Leasing (en ocasiones identificado como Popular Auto). El 17 de octubre de 2000, Popular Leasing compró el vehículo seleccionado por el Sr. Andréu de JP Motors en cuarenta mil dólares ($40,000.00),[1] y se lo arrendó el mismo día al recurrido. De acuerdo con el contrato de arrendamiento, el Sr. Andréu pagó un pronto de cinco mil dólares ($5,000.00) a Popular Leasing y se obligó a pagar una mensualidad de seiscientos noventa y ocho dólares ($698.00) durante sesenta (60) meses, con la opción de comprar el vehículo por el precio de nueve mil novecientos dólares ($9,900.00) al cumplirse el término del contrato.

Mediante el *lease*, Popular Leasing le transfirió al Sr. Andréu todas las garantías provistas por el vendedor, advirtiendo que si el vehículo no le era satisfactorio, debía "presentar[] su reclamación únicamente contra el

---

[1] Según el contrato de arrendamiento, el precio del vehículo se pactó en cuarenta mil dólares ($40,000.00), y los costos de originación sumaban unos cuatrocientos veinticinco dólares ($425.00) adicionales.

suplidor u otra persona y no contra [Popular Leasing]".**2**
Por su parte, el Sr. Andréu se obligó a no cancelar o revocar el arrendamiento "en momento alguno por razón alguna" y a pagar todos los cánones de arrendamiento incondicionalmente "aún si el vehículo le es robado, dañado o destruido, si tiene defectos, o si … ya no [se] puede utilizar[]".**3**

Asimismo, el recurrido confirió varias garantías a favor del arrendador. En el anejo al contrato titulado "Recibo de Entrega y Aceptación y Certificación del Arrendatario", el recurrido certificó que la unidad fue recibida de forma satisfactoria, en buenas condiciones, que no adolecía de defecto alguno, que estaba operando satisfactoriamente, y que aceptaba la unidad de forma irrevocable. Reiteró, además, que no podía cancelar el contrato por ningún motivo y que aceptaba que el financiador no respondería por defectos, garantías, servicio, o fallo de la unidad.

También se suscribieron dos (2) relevos de responsabilidad como parte de los negocios. Ambos relevos –uno otorgado por el Sr. Andréu para el beneficio de Popular Auto, y el segundo suscrito por JP Motors a favor del arrendador y arrendatario– garantizaban el título del vehículo y que el mismo estaba libre de toda carga o gravamen, a la vez que acordaron defender e indemnizar

---

**2**    Véase, Cláusulas 7(C), 7(F) del contrato.

**3**    Véase, Cláusulas 7(A), 7(B) del contrato.

toda reclamación que surgiera en relación a dichas garantías.

En febrero de 2002, el Sr. Andréu empezó a confrontar graves problemas con su vehículo, el cual aún estaba bajo garantía.[4] El sistema electrónico del interior del vehículo, incluyendo los "power windows", "power locks", "sunroof" y computadora le fallaban al extremo de convertir el vehículo en inservible. El 5 de febrero de 2002 el Sr. Andréu llevó el vehículo al representante autorizado y agente de servicios de garantía de Audi en Puerto Rico, Gómez Hermanos Kennedy, Inc. (Gómez Hermanos), para ser reparado. Durante esta primera visita, el vehículo permaneció en Gómez Hermanos hasta el 8 de febrero de 2002, para un total de cuatro (4) días. Dentro del mismo mes, los problemas se volvieron a manifestar. El Sr. Andréu regresó a Gómez Hermanos el 26 de febrero de 2002, donde su vehículo se quedó hasta el 8 de marzo de 2002, para un total de once (11) días adicionales. Debido a que los desperfectos continuaban presentándose, el recurrido no tuvo otro remedio que regresar nuevamente a Gómez Hermanos por tercera vez el 18 de abril de 2002. Luego de transcurridos otros diecinueve (19) días con el vehículo en el taller mecánico, el Sr.

---

[4] Aunque surgen dos (2) fechas diferentes para la expiración de la garantía del vehículo en el expediente, es decir, el 2 de marzo de 2002 y el 15 de agosto de 2002, para propósitos del presente recurso esta inconsistencia es inmaterial, ya que el Sr. Andréu reclamó el arreglo de su vehículo oportunamente bajo cualquiera de los dos (2) supuestos.

Andréu pasó a recoger el vehículo el 6 de mayo de 2002, cuando le informaron que todavía no estaba listo.

El 14 de mayo de 2002, mientras el vehículo permanecía aún en Gómez Hermanos en el cuarto intento de atender los defectos, el Sr. Andréu envió una carta vía facsímil a Gómez Hermanos, informando todo lo sucedido hasta entonces con respecto a su vehículo y concediéndole una última oportunidad de cinco (5) días para finalizar la reparación del mismo. Advirtió que de lo contrario, debían sustituir el vehículo por uno de igual calidad y precio. El Sr. Andréu nunca recibió una contestación a su reclamo y el vehículo continuó fuera de servicio y en manos de Gómez Hermanos hasta el 19 de julio de 2002. Esta cuarta visita duró setenta y cinco (75) días.

El 26 de junio de 2002, antes de ser notificado que el vehículo estaba arreglado, el Sr. Andréu cursó cartas certificadas con acuse de recibo a Gómez Hermanos, JP Motors y Popular Leasing comunicando sus intenciones en cuanto al vehículo. Para ese momento, habían transcurrido un total de ochenta y seis (86) días durante los cuales el Sr. Andréu, como usuario del vehículo, estuvo privado de su uso desde su primera visita a Gómez Hermanos. El Sr. Andréu les informó a Gómez Hermanos y a JP Motors que por razón de los vicios ocultos del vehículo "resolv[ía] el contrato de compraventa del vehículo y el de arrendamiento financiero suscrito con Popular Leasing". Les reclamó "la devolución del precio total pagado por el vehículo, los

gastos incurridos, así como los daños y perjuicios causados".[5] En la carta dirigida a Gómez Hermanos añadió que "en relación al vehículo en cuestión en lo sucesivo se comuniquen con Popular Leasing and Rental, Inc., a quienes como titulares del vehículo se le ha hecho entrega del mismo en sus facilidades".

En su carta a Popular Leasing, el Sr. Andréu repitió que resolvía el contrato de arrendamiento suscrito con ellos y que daba el vehículo por entregado en las facilidades de Gómez Hermanos. Concluyó la carta con el siguiente mensaje:

> Debe quedar meridianamente claro que desde este momento el suscribiente no realizará pago adicional alguno a su compañía por concepto del arrendamiento del vehículo, advirtiéndose que de afectárseme en el futuro el crédito por esta situación constituirá una causa de acción por los daños y perjuicios que ello pueda causarme.

Conforme con lo anterior, Popular Auto recuperó el vehículo en Gómez Hermanos el 8 de agosto de 2002.[6]

El 13 de agosto de 2002 Popular Auto le notificó por escrito al Sr. Andréu que adeudaba un balance de arrendamiento ascendente a treinta y dos mil novecientos once dólares con cuarenta y nueve centavos ($32,911.49). También informó el hecho de que había transcurrido el término pactado para obtener ofertas de compra o arrendamiento del vehículo sin éxito alguno. Por lo

---

[5]     Ap. 62, 66-67.

[6]     Notamos que en el expediente surgen varias fechas en que alegadamente ocurrió este evento, incluyendo, además, el 1 y el 2 de agosto de 2002. Ap. 105, 115.

tanto, se le concedía el término adicional provisto en el *lease* para que consiguiera un comprador o pagara lo adeudado. Ante el silencio del Sr. Andréu, Popular Auto procedió a vender el vehículo en pública subasta el 26 de septiembre de 2002 por dieciséis mil quinientos dólares ($16,500.00). El 17 de octubre de 2002, Popular Auto le notificó al Sr. Andréu de la venta e informó que el balance de la deuda quedaba en dieciséis mil cuatrocientos once dólares con cuarenta y nueve centavos ($16,411.49).

El nuevo dueño del Audi confrontó los mismos defectos que afectaron al Sr. Andréu y consecuentemente lo llevó en dos (2) ocasiones adicionales a Gómez Hermanos. Después de más de un (1) mes en el taller, el vehículo finalmente fue reparado de manera definitiva en noviembre de 2002.

El litigio que ahora nos ocupa comenzó el 1 de julio de 2002, fecha en que el recurrido presentó su Demanda en el Tribunal de Primera Instancia (TPI) solicitando la rescisión del contrato de compraventa y de arrendamiento financiero del vehículo, incluyendo como demandados a Popular Leasing, JP Motors y Gómez Hermanos.[7] La Demanda planteó que, por razón de los vicios ocultos del vehículo, JP Motors y Gómez Hermanos le respondían solidariamente al Sr. Andréu por el precio pagado por el vehículo, además de gastos e intereses. Reclamó en la alternativa que le pagaran esa cantidad directamente a Popular Leasing

---

[7] También nombró a Audi AG y/o Audi North America como parte codemandada, aunque del expediente se desprende que esta parte aparentemente nunca fue emplazada.

después de compensar a los demandantes sus gastos y desembolsos. Solicitó, además, que JP Motors y Gómez Hermanos le compensaran los daños y perjuicios sufridos por él a consecuencia de los vicios del vehículo, estimados en una cantidad ascendente a cincuenta mil dólares ($50,000.00). También solicitó al TPI que ordenara a Popular Leasing que se abstuviera de cobrarle los cánones de arrendamiento pendientes y le compensara por sus daños. Gómez Hermanos y Popular Leasing contestaron la Demanda, mientras que JP Motors, a pesar de haber solicitado una prórroga para responder, nunca sometió una alegación.

Popular Leasing presentó una Reconvención argumentando que los hechos exponían la violación del *lease* por parte del Sr. Andréu al resolver el contrato unilateralmente y, por lo tanto, el recurrido era responsable del balance adeudado de dieciséis mil cuatrocientos once dólares con cuarenta y nueve centavos ($16,411.49). Adujo, además, que Popular Leasing no respondía por la condición defectuosa del vehículo ya que, conforme al contrato, era inmune a toda reclamación por vicios, incumplimiento de garantías y/o daños que resultaran como consecuencia de estos.[8]

---

[8] Popular Leasing también sometió una Demanda contra Coparte contra JP Motors y Gómez Hermanos para recuperar el monto de la deuda en la eventualidad que el Sr. Andréu prevaleciera y se decretase la rescisión del contrato de compraventa del vehículo.

Por no existir hechos controvertidos, el TPI decidió resolver el caso por la vía sumaria. El Sr. Andréu argumentó que JP Motors y Gómez Hermanos respondían por el precio del vehículo, apoyándose en la Ley Complementaria de Garantías de Vehículos de Motor (Ley Complementaria de Garantías),[9] ahora derogada,[10] la cual obligaba a un vendedor a comprar nuevamente o reemplazar un vehículo de motor que no se ajustaba a la garantía de estar presentes los criterios allí establecidos; o, en la alternativa, conforme la doctrina de saneamiento por vicios ocultos.[11] Gómez Hermanos y Popular Auto se opusieron a dicha moción y solicitaron que en su lugar se emitiera sentencia sumaria a su favor. Popular Auto, por su parte, adujo que la reclamación en su contra no procedía porque, aunque un arrendatario típicamente puede subrogarse en el lugar del arrendador y reclamar la garantía directamente del proveedor, esto a base de la Ley para Regular los Contratos de Arrendamientos de Bienes Muebles (Ley para Regular los Contratos de Arrendamientos),[12] en este caso era imposible rescindir el contrato de compraventa puesto que el vehículo para ese entonces estaba en manos de un tercero, lo que impedía restituir las contraprestaciones.

---

[9]   Ley Núm. 300-2000 (10 L.P.R.A. sec. 2066 *et seq.* (2004)).

[10]   Ley Núm. 529-2004.

[11]   Artículos 1373-1375 del Código Civil, 31 L.P.R.A. secs. 3841-3843 (1990).

[12]   Ley Núm. 76-1994 (10 L.P.R.A. 2401 *et seq.* (2004, Supl. 2011)), según enmendada.

El 23 de febrero de 2006 el TPI dictó Sentencia Sumaria a favor del Sr. Andréu, concediéndole, además, gastos y honorarios de abogado. El TPI determinó, como parte de los hechos no controvertidos, que el vendedor-distribuidor del vehículo lo fue JP Motors; que el mismo era responsable de honrar las garantías del fabricante; que Gómez Hermanos era el representante autorizado y agente de garantía del manufacturero (Audi) en Puerto Rico, y que el vehículo presentaba vicios.

Concluyó que no procedían las reclamaciones del recurrido contra ningún demandado bajo la Ley Complementaria de Garantías, ni bajo la teoría de saneamiento por vicios ocultos, por éste no tener legitimación activa, ya que no era el dueño del vehículo, y por ya no existir el bien para que el vendedor lo comprara.[13] Sin embargo, el TPI encontró que, a base del relevo de responsabilidad suscrito por JP Motors, éste le respondía a Popular Auto por el balance adeudado del arrendamiento en lugar del Sr. Andréu, y también venía obligado a indemnizar al Sr. Andréu por los ochenta y seis (86) días que estuvo privado del uso de su vehículo, además de las costas, gastos y honorarios de abogado.

---

[13] En cuanto a Gómez Hermanos, el TPI especificó, y el Tribunal de Apelaciones luego afirmó, que bajo ambas teorías de ley propuestas por el Sr. Andréu, a esa entidad no le correspondía responsabilidad alguna por el hecho de que el vehículo presentara vicios que no se pudieron curar de manera oportuna. Véase 10 L.P.R.A. sec. 2069(b)(1)(2004).

Mediante su "Moción de Reconsideración y Segunda Moción de Sentencia Sumaria", Popular Auto planteó que la Sentencia Sumaria no dispuso de la totalidad del caso al no expresarse sobre su Reconvención y que el remedio resultaba ser trunco, ya que JP Motors era insolvente y había cerrado sus operaciones en Puerto Rico.[14] Arguyó, además, que no obstante el relevo de JP Motors, el Sr. Andréu continuaba directamente obligado a pagar la deuda entera del *lease* al financiador conforme el contrato de arrendamiento.

El TPI acogió dicha reconsideración y modificó su determinación original. En su Sentencia Sumaria Enmendada dictada el 10 de mayo de 2007, declaró *Ha Lugar* la Reconvención de Popular Auto y ordenó al Sr. Andréu pagarle a Popular Auto el dinero adeudado en calidad de arrendamiento financiero del vehículo, más honorarios de abogado razonables. Por otro lado mantuvo, a base del relevo de JP Motors, que éste indemnizara al Sr. Andréu por la deficiencia pendiente del arrendamiento, más los días que se encontró sin el uso de su vehículo debido a los vicios.

Inconforme, el Sr. Andréu recurrió al Tribunal de Apelaciones. Examinados los alegatos de Popular Auto, Gómez Hermanos y JP Motors, el foro apelativo intermedio reinstaló la Sentencia Sumaria originalmente emitida por

---

[14]   Véase también la pág. 19 del Alegato de JP Motors ante el Tribunal de Apelaciones.

el TPI. El Tribunal de Apelaciones decretó que el Sr. Andréu había cumplido con sus obligaciones contractuales. Entendió, además, que al vender el vehículo en subasta en lugar de procurar la rescisión de la compraventa del vehículo del proveedor (JP Motors) conforme la Ley Complementaria de Garantías, Popular Auto se auto-infligió sus daños y no podía cobrarle al Sr. Andréu lo que éste adeudaba como arrendatario.

Popular Leasing acudió ante nos oportunamente, mediante recurso de *certiorari*, señalando los siguientes cuatro (4) errores:

(1)  El Tribunal de Apelaciones [erró] al resolver que el hecho de que el apelante entregara voluntariamente la unidad y dejara de hacer los pagos a que se obligó en el contrato, no constituye incumplimiento del contrato de leasing. La sentencia del Tribunal de Apelaciones injustificadamente desechó las obligaciones contractuales entre las partes y no tomó en consideración el relevo otorgado por el apelante relevando al financiador por los defectos que pudiera tener la unidad y obligándose a pagar el financiamiento sin importar que la unidad tuviera defectos.

(2)  Erró el Tribunal de Apelaciones al resolver que Popular Auto tenía la obligación de instar una acción para obligar al proveedor[,] manufacturero o distribuidor a relevar al deudor del contrato de financiamiento.

(3)  Erró el Tribunal de Apelaciones al aceptar la teoría de que Popular Auto se autoinfligió sus daños especialmente cuando dicha teoría fue traída por primera vez en apelación y nunca fue alegada antes de la apelación.

(4)  Erró el Tribunal de Apelaciones al reinstalar la primera sentencia dictada por

el TPI cuando la misma no dispone de forma alguna de la Reconvención de Popular, por lo que entonces dicha alegación continúa vigente y no se ha dictado un remedio completo. El Tribunal de Apelaciones tampoco tomó en consideración de que el proveedor de la [u]nidad [JP] Motors cerró operaciones y Popular Auto no puede recuperar nada de dicha parte.

Evaluado el recurso, acordamos expedir. Tras analizar todos los escritos ante nuestra consideración, así como el derecho aplicable, procedemos a resolver las controversias presentadas, enfocándonos principalmente en el segundo error señalado.

## II

### A. CONTRATO DE *LEASING*

El contrato de arrendamiento financiero o *leasing* "es un negocio jurídico cuyo contenido está formado por varias declaraciones de voluntad, las cuales producen una relación jurídica [entre las partes suscribientes] y establecen los términos que la regulan." CNA Casualty of P.R. v. Torres Díaz, 141 D.P.R. 27, 33 (1996). El arrendamiento financiero se destaca por ser el producto de una relación tripartita la cual se organiza a través de dos (2) negocios separados. El arrendador sirve como intermediario financiero entre el proveedor (vendedor o suplidor) y el arrendatario (usuario). Meyers Bros. v. Gelco, 114 D.P.R. 116, 120 (1983). Típicamente, después de que el arrendatario escoja el bien que quiere usar y llega a un acuerdo con el arrendador para que se otorgue

un *lease*, éste compra el bien del proveedor y se lo arrenda a aquél por un término fijo irrevocable. Class v. Vehicle Eqmnt. Leasing Co., 143 D.P.R. 186, 197 (1997). No obstante esa realidad comercial, el contrato de arrendamiento financiero consagra las obligaciones y los derechos entre el arrendador y arrendatario. Véase CNA Casualty of P.R. v. Torres Díaz, *supra*, a las págs. 33-34; Class v. Vehicle Eqmnt. Leasing Co., *supra*, a la pág. 197.

A través de nuestra jurisprudencia, hemos identificado la institución del arrendamiento financiero como una relativamente nueva forma de financiamiento, "un contrato atípico, *sui géneris*, producto de la realidad cambiante del tráfico mercantil". Class v. Vehicle Eqmnt. Leasing Co., *supra*, a la pág. 198 (citando Meyers Bros. v. Gelco, *supra*, a la pág. 121). Antes de aprobarse la Ley para Regular los Contratos de Arrendamientos, el *lease* se regía por el principio de la autonomía contractual consagrado por el Artículo 1207 de nuestro Código Civil, 31 L.P.R.A. sec. 3372 (1990). Class v. Vehicle Eqmnt. Leasing Co., *supra*, a la pág. 198 (citando Meyers Bros. v. Gelco, *supra*, a la pág. 123). Es menester notar que uno de los objetivos de la Ley para Regular los Contratos de Arrendamientos fue estimular la celebración de estos contratos para lograr un crecimiento económico, lo cual denota la importancia e impacto que este tipo de negocio ha tenido en la sociedad y en el desarrollo mercantil puertorriqueño. Art. 2 de la Ley Núm. 76-1994, *supra*.

Es característica innata del *lease* que el financiador retiene el título sobre la unidad arrendada a lo largo del arrendamiento financiero, mientras que el arrendatario goza de su posesión y uso, siempre y cuando no incumpla con las cláusulas del contrato. 10 L.P.R.A. sec. 2408 (2004); CNA Casualty of P.R. v. Torres Díaz, *supra*, a las págs. 33-34; Nieves Vélez v. Bansander Leasing Corp., 136 D.P.R. 827, 838 (1994); Meyers Bros. v. Gelco, *supra*, a la pág. 121. Es sólo al vencerse el término del contrato que el usuario tiene una triple opción de comprar el bien por el valor residual pactado en el *lease*, realquilarlo mediante un nuevo contrato, o devolverlo al arrendador. 10 L.P.R.A. sec. 2417 (2004); Meyers Bros. v. Gelco, *supra*, a la pág. 121. También cabe señalar que la cuota de alquiler pactada en el arrendamiento financiero suele consistir de "tres componentes: la amortización del costo del equipo, los intereses y demás cargas financieras, y la utilidad o beneficio" del uso del bien arrendado. Meyers Bros. v. Gelco, *supra*, a la pág. 120. "El primer componente lleva a la fijación, *por un período irrevocable*, de una suma que cause generalmente la amortización total del bien a la conclusión del compromiso." Íd. (énfasis suplido).

Claro está, aparte de la información requerida en todo contrato de arrendamiento bajo la Ley para Regular los Contratos de Arrendamientos, los términos y las condiciones del arrendamiento financiero varían de *lease*

en *lease*.  10 L.P.R.A. sec. 2403 (2004).  En el caso de Meyers Bros. v. Gelco, *supra*, tuvimos la primera oportunidad de pronunciarnos en torno a este modo emergente de contratar.  Ahí resolvimos que una cláusula exonerando al arrendador de toda responsabilidad por la garantía del vehículo es válida, ya que no es contraria al interés público.  Íd. a la pág. 125.  Deducimos que ese tipo de cláusula, la cual traspasa al usuario todo riesgo excepto la financiación del bien, se fundamenta en que el negocio básico del arrendador es proveer financiación, mientras que son funciones subsidiarias las de comprar y arrendar la unidad.  Íd. a la pág. 123.

Expandiendo sobre esa noción, en CNA Casualty of P.R. v. Torres Díaz, *supra*, notamos que "[p]or lo general, los contratos de arrendamiento financiero contienen ciertas garantías destinadas a proteger al arrendador [o más bien, su interés económico] de sucesos inadvertidos que puedan producirse durante la duración del contrato", tal como, por ejemplo, requerir al usuario suscribir una póliza de seguro.  Íd. a la pág. 34.  Cuando un arrendatario se compromete a asumir todos los riesgos e indemnizar al arrendador por los daños o destrucción de la unidad arrendada, su obligación de pagar la totalidad de los cánones mensuales establecidos en el contrato no desaparece, sin importar la condición en que se encuentra el bien durante la vigencia del arrendamiento.  Íd. a la pág. 35.  Por cierto, el arrendamiento financiero está

diseñado con la finalidad de recuperar la inversión total del arrendador e "impedir que la pérdida de la unidad arrendada se convierta en una pérdida financiera para el arrendador". Íd. a la pág. 36.

Partiendo de este marco normativo, procedemos al análisis que nos ocupa.

### B. INCUMPLIMIENTO DEL *LEASE* POR EL ARRENDATARIO

Popular Auto alega que el tribunal apelativo intermedio erró al resolver que el Sr. Andréu no incumplió con el contrato de arrendamiento financiero, toda vez que el recurrido como arrendatario voluntariamente entregó el vehículo al arrendador antes de que se cumpliera el término fijo del *lease* y dejó de hacer los pagos mensuales a causa de los desperfectos que sufrió el vehículo durante varios meses.[15] Para determinar si se cometió el error señalado, es necesario examinar las cláusulas del contrato de arrendamiento otorgado en el caso de autos. Conforme al *lease*, Popular Auto acordó comprar el vehículo seleccionado por el Sr. Andréu para propósitos de arrendárselo bajo ciertos términos y condiciones impresas en "letra pequeña". Las "Condiciones Importantes" destacadas en la cláusula 7 del contrato, en lo pertinente, incluyeron lo siguiente:

> (A) <u>USTED NO PODR[Á] CANCELAR O REVOCAR ESTE ARRENDAMIENTO EN MOMENTO ALGUNO POR RAZ[Ó]N ALGUNA</u>[.]

---

[15] De acuerdo al expediente, estos hechos no están en controversia.

(B) USTED EST[Á] <u>INCONDICIONALMENTE OBLIGADO A PAGAR TODOS LOS PAGOS DEL ARRENDAMIENTO Y OTRAS CANTIDADES VENCIDAS POR EL T[É]RMINO COMPLETO</u> NO IMPORTA LO QUE SUCEDA, AUN SI EL VEH[Í]CULO LE ES ROBADO, DAÑADO O DESTRUIDO, <u>SI TIENE DEFECTOS</u>, O SI USTED YA NO PUEDE UTILIZARLO.

(C) LE ESTAMOS ARRENDANDO EL VEH[Í]CULO A USTED "COMO EST[Á]" Y NO LE HEMOS HECHO REPRESENTACI[Ó]N NI GARANT[Í]A, YA SEA EXPRESA O IMPL[Í]CITA (INCLUYENDO CUALQUIER GARANT[Í]A IMPL[Í]CITA DE FUNCIONALIDAD O CONVENIENCIA PARA UN PROP[Ó]SITO EN PARTICULAR), RELACIONADO CON EL VEH[Í]CULO. NOSOTROS REPUDIAMOS TODAS DICHAS GARANT[Í]AS DE CUALQUIER NATURALEZA QUE ESTAS SEAN. <u>NOSOTROS ACORDAMOS EN TRANSFERIR A USTED TODAS LAS GARANT[Í]AS SI ALGUNA, HECHAS POR EL SUPLIDOR A NOSOTROS</u>.

....

(F) SI EL VEH[Í]CULO NO OPERA SEG[Ú]N REPRESENTADO POR EL SUPLIDOR, O SI EL SUPLIDOR O CUALQUIER OTRA PERSONA DEJARE DE PROVEER CUALQUIER SERVICIO, O SI EL VEH[Í]CULO NO ES SATISFACTORIO POR CUALQUIER OTRO MOTIVO, <u>USTED PRESENTAR[Á] SU RECLAMACI[Ó]N [Ú]NICAMENTE CONTRA EL SUPLIDOR U OTRA PERSONA Y NO CONTRA NOSOTROS</u>.

(Énfasis suplido).

El Sr. Andréu firmó, además, un "Recibo de Entrega y Aceptación", certificando que el vehículo arrendado operaba satisfactoriamente, que lo aceptó de forma irrevocable, y que sus obligaciones eran absolutas e incondicionales. Finalmente, también se otorgó un "Relevo de Responsabilidad" a beneficio de Popular Auto, exonerando al financiador de responsabilidad contra toda reclamación que surgiera o estuviese relacionada a las garantías de título perfecto del vehículo.

Resulta de forma clara y precisa que el Sr. Andréu se comprometió a pagar las mensualidades del arrendamiento por el término completo del contrato sin importar la condición del vehículo, incluyendo específicamente la eventualidad de que sufriera defectos mecánicos, como ocurrió en el caso de autos. A la vez, se le extendió al recurrido el derecho de reclamar las garantías del vehículo directamente al vendedor, JP Motors.

Aun así, el Sr. Andréu cursó una carta a Popular Auto el 26 de junio de 2002 anunciando que resolvía el contrato de arrendamiento por el vehículo sufrir defectos alegadamente irreparables, por lo cual no pagaría otra mensualidad, a la vez que dio el vehículo por entregado en las facilidades de Gómez Hermanos. Pasaron varios meses sin que el Sr. Andréu remitiera pago alguno, por lo cual Popular Auto eventualmente tomó posesión del vehículo y lo vendió en subasta según provisto en el *lease*.

El Tribunal de Apelaciones erróneamente refrendó las acciones del recurrido al determinar que éste no tenía otro remedio que no fuera actuar como lo hizo y afirmar repetidamente que el Sr. Andréu no incumplió con sus obligaciones contractuales. Al dejar de pagar las mensualidades del arrendamiento vencidas con la expresada intención de liberarse del término aún pendiente bajo el contrato, el Sr. Andréu efectivamente infringió los términos y las condiciones del *lease* al que se obligó voluntariamente a cumplir. Si bien es cierto que el Sr.

Andréu llevó el vehículo en cuatro (4) ocasiones a Gómez Hermanos para que se ajustara a la garantía, esto no le justificaba a cancelar unilateralmente el contrato de arrendamiento financiero con el arrendador, Popular Auto. Véase, por ejemplo, lo dispuesto en el Artículo 1208 del Código Civil, 31 L.P.R.A. sec. 3373 (1990) ("La validez y el cumplimiento de los contratos no pueden dejarse al arbitrio de uno de los contratantes.").

Por lo tanto, concluimos que el primer error señalado por Popular Auto fue cometido.

### III

Una vez resuelta la controversia inicial, surge la interrogante principal que nos ocupa, esto es, qué consecuencias tiene el que un bien arrendado, estando aún en garantía, sufre defectos tan graves que motivan al arrendatario a entregar el bien al financiador prematuramente e incumplir con los términos del *lease*. Bajo estas circunstancias, nos toca resolver si, no obstante los defectos del bien, el arrendador le puede reclamar al arrendatario la totalidad de la deuda restante conforme lo pactado en el *lease*; o, si al contrario, viene obligado a instar una acción de rescisión de compraventa en contra de la entidad responsable de honrar la garantía del bien arrendado, para así recuperar el monto adeudado. Contestamos lo primero en la afirmativa. Veamos.

## A. LEY PARA REGULAR CONTRATOS DE ARRENDAMIENTOS

Comenzamos el análisis acudiendo directamente al estatuto que rige el contrato ante nos. La Ley para Regular Contratos de Arrendamientos provee para que un arrendador financiero recupere completamente su inversión en un arrendamiento en la eventualidad que el arrendatario incumpla con el *lease* y entregue el bien arrendado voluntariamente al arrendador:

> *Cuando el arrendatario incumpla con el arrendamiento y el arrendador obtiene la posesión del bien arrendado, sea mediante entrega voluntaria* o reposeído por vía judicial, éste podrá recibir ofertas de compra de terceros y notificará de las mismas al arrendatario mediante carta certificada…. Si luego que el arrendador obtuviere la posesión del bien arrendado, éste no lograre obtener ofertas de compra de terceros dentro de un término de quince (15) días, notificará de este hecho al arrendatario y le otorgará un período de quince (15) días para que consiga un comprador *o pague lo adeudado….*
>
> [S]i existe una deficiencia por la diferencia entre la cantidad a recibirse por la venta y el balance adeudado por el arrendatario, *éste pagará dicha diferencia al arrendador.*

10 L.P.R.A. sec. 2424 (2004) (énfasis suplido).

Con esta disposición estatutaria, la Legislatura protegió los intereses de los arrendadores financieros contra la posibilidad de no recuperar su riesgo e inversión total en los arrendamientos. De acuerdo a la ley, un arrendador que advenga en la posesión del bien arrendado antes de que se cumpla el término del *lease* podrá obtener el balance pendiente del arrendamiento cancelado de una (1) de dos (2) maneras. Tiene la opción

de vender el bien a un tercero, o, de no ser posible la venta por falta de ofertas de compra, o si queda una deficiencia en el balance adeudado después de dicha venta, el arrendador podrá recuperar la diferencia adeudada directamente del arrendatario. Notamos que el estatuto no incluye excepción alguna a este procedimiento de recuperación financiera, ni siquiera si el incumplimiento del *lease* y la entrega del bien fueron ocasionados por los vicios ocultos del bien mueble.

Previamente resolvimos que la entrega del bien arrendado en el caso de incumplimiento de un contrato de arrendamiento financiero no compensa adecuadamente al arrendador financiero por su riesgo e inversión en el negocio otorgado. <u>Class v. Vehicle Eqmnt. Leasing Co.</u>, *supra*, a la pág. 203. En ese caso, aunque los hechos precedieron la aprobación de la Ley para Regular Contratos de Arrendamientos, nos valimos de su historial legislativo para diferenciar la institución de arrendamiento financiero de un contrato de venta condicional. <u>Íd.</u> a las págs. 199-202. En esa ocasión, nos resultó informativo que el Informe de la Asociación de Bancos de Puerto Rico – el cual fue acogido e incorporado en el proyecto de ley que luego se convirtió en la Ley para Regular Contratos de Arrendamientos – sostuvo que "[l]a entrega del bien previo a la terminación del contrato o el pago de las sumas pendientes no cubre los costos y gastos incurridos por el [a]rrendador", por lo que un arrendatario debe ser

responsable por su obligación total según pactada.  Íd. a las págs. 200-202.

Por otro lado, dado que conforme al Artículo 1044 del Código Civil, 31 L.P.R.A. sec. 2994 (1990), todo contrato tiene fuerza de ley entre las partes contratantes, es necesario también examinar el contrato de arrendamiento financiero bajo el cual se define la relación jurídica entre el arrendador y arrendatario para determinar si los contratantes estipularon qué ocurriría, o quién respondería, en la eventualidad de que el bien arrendado sufriera de defectos.  Si, como en el caso de autos, el *lease* provee que el arrendador está completamente exonerado de responsabilidad por cualquier garantía del bien arrendado – cláusula que ya determinamos es válida en Meyers Bros. v. Gelco, *supra* –, entonces la presencia de defectos en el bien arrendado no altera la responsabilidad a la cual el arrendatario voluntariamente se comprometió de continuar honrando su obligación de pagar el arrendamiento hasta su fin.  Véase Artículo 1207 del Código Civil, 31 L.P.R.A. sec. 3372 (1990).  De igual manera, la presencia de dichos defectos tampoco altera el derecho del arrendador de cobrar la financiación del bien en su totalidad, tal como fuera pactado.

### B. OBLIGACIÓN DE INSTAR O RESPALDAR LA RESCISIÓN DE LA COMPRAVENTA DEL BIEN ARRENDADO

No obstante lo provisto por la Ley para Regular Contratos de Arrendamientos y la presencia de un *lease* que

releva al arrendador de toda garantía relacionada al bien arrendado, el Tribunal de Apelaciones concluyó en su dictamen que el arrendador, Popular Auto, tenía la obligación de instar o respaldar una reclamación contra el vendedor del vehículo para rescindir la compraventa de la unidad al amparo de la Ley Complementaria de Garantías. No tiene razón.

La Ley Complementaria de Garantías disponía, en lo pertinente, que si un manufacturero o su agente de servicio autorizado no podía ajustar un vehículo a la garantía después de un número razonable de intentos, el manufacturero, dentro de cuarenta (40) días, tenía que comprar nuevamente el vehículo y el consumidor tendría un derecho incondicional para escoger entre un reembolso del precio de compra menos la compensación razonable por uso, o reemplazo de vehículo. 10 L.P.R.A. sec. 2069(b)(1)(2004). La definición de consumidor incluía a un adquiriente o arrendatario de un vehículo de motor utilizado principalmente para fines personales, familiares o de la casa. 10 L.P.R.A. sec. 2066(g)(2004). Se presumía que un número razonable de intentos habían sido emprendidos para ajustar el vehículo a la garantía si el vehículo no estuvo disponible por razón de reparación de uno o más vicios por el agente de servicios autorizado del manufacturero por un total acumulativo de treinta (30) días o más. 10 L.P.R.A. sec. 2069(c)(2)(2004).

Sin embargo, una lectura detenida de la Ley Complementaria de Garantías revela que nada disponía sobre una obligación del arrendador de respaldar una acción del arrendatario contra el manufacturero.

Por otro lado, es menester señalar que la Ley para Regular Contratos de Arrendamientos también contiene una sección titulada "Garantías", la cual dirige cómo debe presentarse una reclamación relacionada a la garantía del bien arrendado contra el proveedor. No obstante, tampoco les impone una obligación a los arrendadores al respecto. Más bien, la Ley para Regular Contratos de Arrendamientos le facilita a los arrendatarios el instar una reclamación de garantía contra los proveedores. Así pues, en lo pertinente dispone:

....

El arrendatario tendrá derecho a reclamar del proveedor el cumplimiento de las obligaciones, promesas y garantías, así como también podrá reclamar todos los derechos de saneamiento por vicios ocultos sobre el bien arrendado. *Si el arrendatario no reclama los derechos que tiene contra el proveedor, el arrendador podrá reclamarlos….*

....

10 L.P.R.A. sec. 2412 (2004) (énfasis suplido).

Tal como está escrita, la clara letra de la ley no obliga al arrendador a reclamar el cumplimiento de las garantías en contra del proveedor. Es únicamente después de que un arrendatario decide no ejercitar una reclamación bajo la garantía que el arrendador puede hacerlo.

Analizadas las Secciones 2412 y 2424 de la Ley para Regular Contratos de Arrendamientos en conjunto con la Ley Complementaria de Garantías, no surge que el derecho del arrendador para recuperar la deuda del arrendatario en el caso en que el bien arrendado sea defectuoso depende de si trató de rescindir la compraventa. Por ende, erró el Tribunal de Apelaciones al resolver que un arrendador viene obligado a instar o respaldar una acción en contra del proveedor para hacer cumplir la garantía y, de no ser posible, rescindir el contrato de compraventa del bien defectuoso. Más bien, la interpretación clara y correcta de las leyes aplicables es que un arrendatario puede reclamar por sí mismo la garantía del bien arrendado del proveedor, así como el saneamiento por vicios ocultos, sin que dicha reclamación dependa del arrendador de manera alguna.

En fin, bajo la Ley Complementaria de Garantías y la Ley para Regular Contratos de Arrendamientos, un arrendatario ciertamente goza de protecciones en la eventualidad de que el bien arrendado sufra de vicios que lo obligue a optar por la terminación temprana del arrendamiento. No obstante, las leyes no permiten que el arrendatario viole sus responsabilidades contractuales con el arrendador. El arrendador tiene el derecho de recuperar la deuda remanente de un *lease* directamente del arrendatario que incumpla con el contrato de arrendamiento y entregue el bien arrendado prematuramente debido a sus

defectos. De igual manera, el financiador no viene obligado a tomar acciones contra el vendedor para rescindir la compraventa del bien por los defectos irreparables. La Ley para Regular Contratos de Arrendamientos le da la opción al arrendador de decidir cómo recuperar lo que invirtió en el otorgamiento del *lease*, de esta manera guardando armonía con el fin del *lease* de no perder el dinero o inversión del arrendador.

## IV

Expuesta y discutida la normativa aplicable al caso de autos, pasamos ahora a resolver conjuntamente las controversias restantes ante nuestra consideración.

### A. OBLIGACIÓN DIRECTA DEL ARRENDATARIO DE PAGAR AL ARRENDADOR

Según notamos anteriormente, el contrato de arrendamiento financiero del caso de autos colocaba todo riesgo de pérdida o menoscabo del uso del bien sobre el Sr. Andréu como arrendatario. A la vez, éste aseguró que completaría el pago de las sesenta (60) mensualidades incondicionalmente. Así pues, Popular Auto exitosa y válidamente contrató para asegurarse de que recuperaría la totalidad de la financiación del vehículo del Sr. Andréu, aunque el vehículo tuviera defectos o se entregara de manera prematura.

Así las cosas, el Sr. Andréu entregó el vehículo a Popular Auto debido a los defectos mecánicos antes

mencionados y suspendió el pago de los cánones vencidos bajo el contrato, incumpliendo así con el *lease*. Luego, el Sr. Andréu intentó transferir su obligación directa de pagar el balance debido bajo el arrendamiento a JP Motors mediante una Demanda de rescisión de la compraventa del vehículo basada en la Ley Complementaria de Garantías, o, en la alternativa, bajo la doctrina de saneamiento por vicios ocultos.

Sin embargo, el Sr. Andréu carecía de legitimación activa para invocar la Ley Complementaria de Garantías por no ostentar el título de arrendatario al momento en que invocó estos derechos. A tenor con su carta fechada el 26 de junio de 2002 y su curso de acción al entregar el vehículo y dejar de pagar las mensualidades del *lease*, el Sr. Andréu unilateralmente resolvió el arrendamiento financiero otorgado con Popular Auto. Esto causó que ya no cualificara bajo la definición de "consumidor" de la Ley Complementaria de Garantías, y que consecuentemente ya no gozara de los privilegios o protecciones que la ley extendía a arrendatarios frente a un proveedor que vendió un bien que no se ajustara a la garantía. El Sr. Andréu debió haber continuado pagando el arrendamiento para poder retener su legitimación activa para rescindir la compraventa del vehículo y así intentar resolver el *lease* bajo este estatuto en particular. Véase Meyers Bros. v. Gelco, *supra*, a la pág. 125 (notando que en Francia "la resci[s]ión del contrato entre el proveedor y la

financiera provoca el desplome del contrato entre ésta y el usuario, por defecto de causa, aunque el segundo contrato no puede rescindirse sin actuar contra el primero", pero negando entrar en ese aspecto del arrendamiento financiero).

Al momento en que el Sr. Andréu entregó el vehículo e incumplió con el *lease*, no sólo se desvinculó del vehículo para efectos de poder reclamar la garantía del vehículo de JP Motors bajo la Ley Complementaria de Garantías,[16] sino que también se activó la Sección 2424 de la Ley para Regular Contratos de Arrendamientos, permitiendo al arrendador, Popular Auto, cobrarle el remanente adeudado luego de haber vendido el bien.  Sin la capacidad de poder rescindir la compraventa del vehículo mediante la Ley Complementaria de Garantías, la obligación del Sr. Andréu de pagar toda la financiación del vehículo a tenor con el arrendamiento financiero permaneció intacta, sin importar que el vehículo tuviera defectos.  Por las razones esbozadas anteriormente, Popular Auto no tenía la obligación de llevar una acción de recisión de la compraventa del vehículo contra JP Motors para relevar al

---

[16]    Debe constar que esta determinación no significa que el Sr. Andréu quedó desprovisto de todo remedio frente al manufacturero o vendedor del vehículo, o que éstos no le responden al Sr. Andréu por los defectos mecánicos del vehículo.  El recurrido tiene el derecho a ser resarcido en daños y perjuicios por JP Motors y/o Audi, tal como señaló en su Demanda.  Cabe señalar, sin embargo, que como indicáramos anteriormente, en el expediente hay información no corroborada de que JP Motors dejó ya de operar y es insolvente, en cuyo caso el Sr. Andréu podría confrontar problemas prácticos en obtener indemnización de ese proveedor por cualquier daño que hubiera podido sufrir. Véase, también, lo indicado en la nota al calce número 7.

arrendatario-deudor del contrato y podía reclamar el balance directamente del Sr. Andréu.

Dado que la entidad financiera sí podía recuperar el dinero debido de parte de su arrendatario, procedía en efecto declarar con lugar la Reconvención del peticionario contra el Sr. Andréu.[17]

## B. AUTOINFLICCIÓN DE DAÑOS

Por consiguiente, en respuesta al tercer error señalado por Popular Auto, encontramos que el Tribunal de Apelaciones erró al determinar que éste se autoinfligió sus daños al vender el vehículo en vez de unirse a la Demanda de rescisión de la compraventa del vehículo. La doctrina de autoinflicción de daños surge cuando una parte promovente se coloca voluntariamente en una posición que le causa un perjuicio irrazonable. Empresas Ferrer v. A.R.Pe., 172 D.P.R. 254, 270 (2007) (citando Asoc. Res. Baldrich, Inc. v. J.P. de P.R., 118 D.P.R. 759, 772 (1987)).

Popular Auto actuó conforme sus derechos estatutarios y contractuales al vender el vehículo y cobrarle el balance del arrendamiento al Sr. Andréu. No se colocó en una posición que le causara perjuicio irrazonable, sino

---

[17] La cuarta controversia planteada por Popular Auto sostiene que la Sentencia del Tribunal de Apelaciones, al adoptar la Sentencia Sumaria original del TPI, no dispone de forma alguna sobre su Reconvención, por lo que dicha alegación continúa vigente y, consiguientemente, el remedio es incompleto. Reconocida la validez jurídica de la Reconvención de Popular Auto contra el Sr. Andréu, dicha controversia se ha tornado académica. Por lo tanto, no es necesario adentrarnos en un análisis jurídico de este señalamiento de error.

que, por el contrario, sus acciones mitigaron el daño causado por el Sr. Andréu al abruptamente intentar rescindir el contrato sin pagar lo adeudado. Popular Auto desconocía si recuperaría lo adeudado por el recurrido, quien incumplió con el contrato otorgado. Al vender el vehículo, al menos se aseguró de recuperar una porción de dicha deuda de parte de un tercero. Posteriormente, amparado en la Ley para Regular Contratos de Arrendamientos, procedió a requerir el pago de la deficiencia de parte del recurrido.

## C. RELEVO DE RESPONSABILIDAD DE JP MOTORS

Según resolvimos anteriormente, el Sr. Andréu, como arrendatario, tiene la responsabilidad directa de pagar la deuda a la cual se obligó frente al arrendador, Popular Auto. Entramos ahora a explicar el por qué el vendedor de la unidad, JP Motors, no tenía dicha responsabilidad frente a Popular Auto por concepto del Relevo de Responsabilidad, tal como resolvió el Tribunal de Apelaciones. Para ello encontramos necesario discutir el alcance del Relevo de Responsabilidad de JP Motors, el cual, en su totalidad, consiste de lo siguiente:

> JOS[É] A. ANDRÉU-FUENTES (Arrendatario), por la presente reconoce que Popular Leasing & Rental, Inc., adquirió un 1998 A-6 Audi WAUBA24B4WN138257, conforme a las instrucciones de JOS[É] A. ANDRÉU-FUENTES (Arrendatario). En referencia a esta transacción, <u>JP MOTORS (C) (Distribuidor) por la presente garantiza</u> a ambos Popular Leasing & Rental, Inc. y JOS[É] A. ANDRÉU-FUENTES (Arrendatario) que todos los arbitrios, impuestos o cualquier otra carga que

pese sobre el vehículo arriba mencionado, han sido pagados y que JP MOTORS (C) (Distribuidor) tiene <u>título perfecto y absoluto sobre dicho vehículo, libre de todo gravamen, cargas o de cualquier otro defecto de título</u>.

<u>JP MOTORS (C) (Distribuidor) por la presente acuerda defender, indemnizar</u>, salvar, proteger y en general relevar a Popular Leasing & Rental, Inc. y JOS[É] A ANDRÉU-FUENTES (Arrendatario), sus cesionarios, agentes y empleados, <u>de toda reclamación</u>, acción, procedimiento, gastos, daños, lesiones, responsabilidades o pérdidas de cualquier tipo o naturaleza, ya sea que estas resulten de la exclusiva negligencia del Arrendador o de otro modo e incluyendo, pero sin limitarse a, honorarios de abogados, costos y gastos de litigio, pagos de transacción y cantidades pagadas para satisfacer sentencias, <u>que surjan de o resulten directa o indirectamente de o estén relacionados con las garantías aquí mencionadas</u>.

(Énfasis suplido).

El Artículo 1233 de nuestro Código Civil, 31 L.P.R.A. sec. 3471 (1990), instruye que cuando vayamos a interpretar un contrato, si los términos son claros y no dejan duda sobre la intención de los contratantes, se aplicará un sentido literal a sus cláusulas. Ahora bien, si las palabras utilizadas en el contrato parecen ser contrarias a la intención evidente de los contratantes, entonces prevalecerá la intención sobre aquéllas. <u>C.F.S.E. v. Unión de Médicos</u>, 170 D.P.R. 443, 450 (2007) ("[S]i los términos de un contrato o de una cláusula contractual… son suficientemente claros como para entender lo que se pacta, hay que atenerse al sentido literal de las palabras y, por ende, los tribunales no pueden entrar

a dirimir sobre lo que las partes alegadamente intentaron pactar al momento de contratar.").

En el caso de autos, el Relevo de Responsabilidad antes citado se expresa de forma clara y precisa, y no arroja duda alguna sobre la intención que compartieron JP Motors y el Sr. Andréu al firmarlo. Ninguna parte argumentó ni presentó prueba demostrando que las palabras de dicho relevo fueran contrarias a la intención de los contratantes. Por lo tanto, nos ceñimos al sentido literal de lo expresado.

Una lectura somera de la cláusula en cuestión nos lleva inevitablemente a concluir que ésta se limita a garantizar los aspectos atenientes al *título* del vehículo. Es decir, certificar la legitimidad del título, así como aseverar que no pesaban sobre él ningún tipo de carga o gravamen. De otra parte, JP Motors se comprometió a indemnizar al arrendador y al arrendatario únicamente en la eventualidad de una reclamación suscitada exclusivamente en relación a esa garantía en particular.

Por lo tanto, el Tribunal de Apelaciones y el TPI erraron en sus respectivos dictámenes al encontrar que, a base del relevo arriba indicado, JP Motors le era responsable a Popular Auto por el balance pendiente del arrendamiento o que tenía que indemnizar al Sr. Andréu por dicho balance más los días que éste estuvo privado del uso de su vehículo debido a los vicios del mismo, habida cuenta de que este aspecto en particular no estuvo

contemplado en el Relevo de Responsabilidad en controversia.

Sin embargo, JP Motors no estaba relevado de toda responsabilidad hacia el Sr. Andréu por los daños incurridos por éste a causa de los vicios ocultos del vehículo, sino que no procedía el resarcimiento deseado de parte del proveedor del vehículo bajo el Relevo de Responsabilidad en controversia.

## V

A base de lo anterior, se dictará Sentencia revocando el dictamen emitido por el Tribunal de Apelaciones y reinstalando la Sentencia Sumaria Enmendada dictada por el Tribunal de Primera Instancia según aquí modificada. Se devuelve el caso al Tribunal de Primera Instancia para que el Sr. Andréu tenga oportunidad de probar sus daños contra JP Motors, según alegado en la Demanda.

Se dictará Sentencia de conformidad.


Roberto Feliberti Cintrón
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| JOSÉ A. ANDRÉU FUENTES Y OTROS<br><br>RECURRIDOS<br><br>v.<br><br>POPULAR LEASING, INC. Y OTROS<br><br>PETICIONARIOS | Núm.: **CC-2008-0726** | *Certiorari* |

**SENTENCIA**

En San Juan, Puerto Rico, a 16 de febrero de 2012.

Por los fundamentos antes expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente Sentencia, se revoca el dictamen emitido por el Tribunal de Apelaciones y se reinstala la Sentencia Sumaria Enmendada dictada por el Tribunal de Primera Instancia según modificada.

Se devuelve el caso al Tribunal de Primera Instancia para que el Sr. Andréu tenga oportunidad de probar sus daños contra JP Motors, según alegado en la Demanda.

Así lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Jueza Asociada señora Fiol Matta y la Juez Asociada Rodríguez Rodríguez concurren sin opinión escrita y el Juez Presidente señor Hernández Denton inhibido.


Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo